UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 19 Cr. 921 (AKH)

NICHOLAS TRUGLIA,

Plaintiff.

Conference
------------------------------x

New York, N.Y.
November 2, 2022
11:00 a.m.

Before:

HON. ALVIN K. HELLERSTEIN,

District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: TIMOTHY V. CAPOZZI
Assistant United States Attorney

WALDEN MACHT & HARAN, LLP
Attorney for Defendant
BY: JEFFREY UDELL

Also Present:
Special Agent Elizabeth Pelker, F.B.I.

(Case called)

THE COURT: Okay. We have two people on the phone. I'll get to that in a minute. But for the government, we have Timothy Capozzi?

MR. CAPOZZI: Correct, your Honor.

THE COURT: And?

MS. PELKER: Special Agent Elizabeth Pelker from the FBI.

THE COURT: For the defendant, Jeffrey Udell?

MR. UDELL: Yes. Good morning, your Honor. With me is my colleague, Adam Cohen. And Mr. Truglia is right next to me, your Honor.

THE COURT: Good morning, all.

There's one person attending by telephone. Who is that, sir?

THE WITNESS: Michael Turpin, the victim.

THE COURT: Michael Turpin. Okay. So you'll listen. Unless asked to say something, be quiet; all right?

MR. TURPIN: That's correct. Thank you, your Honor.

THE COURT: Okay.

All right. Mr. Truglia, have you read the Pretrial report? Take off your mask, please.

THE DEFENDANT: Yes, I read the report, your Honor.

THE COURT: Have you discussed it with your attorneys?

THE DEFENDANT: I have.

THE COURT: Are there any factual errors in the report?

MR. UDELL: Your Honor, we do have some --

THE COURT: Sit down.

MR. UDELL: We do have some --

THE COURT: Take off your mask.

MR. UDELL: Sorry, your Honor.

We do have some errors that I'd like to address whenever your Honor would like to hear them.

THE COURT: Now.

MR. UDELL: Okay.

So first, your Honor, at paragraph 65 -- and this is all obviously in the final report. We addressed objections previously, but in paragraph 65, the report says that the officer asked for a letter from a Dr. Edward Maharan outlining Nick's medical history, including his cardiac arrhythmia diagnosis and prescriptions for medication. In its sentencing submission, the government points out that paragraph and says that Mr. Truglia was not being cooperative by not providing information requested by Probation. And in that paragraph, you'll see the end of 65, it says that he was directed by the Probation Office to obtain a letter from the doctor outlining his medical history, but he was unable to obtain the letter.

So our objections are twofold, your Honor. First, with respect to what the government says, it doesn't say that

he refused to do anything, it said that he was unable to obtain a letter from the doctor. In fact, what the report does not mention--and we would respectfully request that it be amended to mention this--is that we did submit to Probation corroboration. That was the point, asking for the letter from the doctor to corroborate his statement that he was treated, as noted in paragraph 65.

We submitted three pieces of corroboration for that; one was a photograph of his prescription for the medication listed with Dr. Maharan--that is the prescriber; secondly, a letter from his cardiologist to that doctor, Dr. Maharan, in other words, thanking Dr. Maharan for the referral of Mr. Truglia, thereby showing that Dr. Maharan is treating Mr. Truglia; and thirdly, a letter from another doctor of Mr. Truglia noting that he was evaluating Mr. Truglia for the arrhythmia condition that is described in paragraph 65.

So we would respectfully submit that the report, without putting in that we submitted this corroborative evidence, leaves the impression to the government that has argued in its submission--we feel misguidedly--that on that basis, Mr. Truglia was not cooperative with what the Probation Office was requesting of him. And we respectfully request that an amendment be made clear that he was.

THE COURT: Is it true that Mr. Truglia was asked by the probation officer to obtain a letter from Dr. Maharan?

MR. UDELL: Yes, your Honor.

THE COURT: Is it true is that no letter was forthcoming?

MR. UDELL: That is true, your Honor.

THE COURT: Is it true that it was purposefully not forthcoming?

MR. UDELL: That is not true. He made efforts to get the letter.

Mr. Truglia was incarcerated at the time that that request came in and was unable to get a response from the doctor. But as I said, we submitted on his behalf, the other corroborating --

THE COURT: I think it should be in compliance with what the probation officer asks. And Dr. Maharan should be asked again by you and by Mr. Truglia for the letter requested by the probation officer.

MR. UDELL: Yes, your Honor. We can do that.

THE COURT: Make sure it's done.

MR. UDELL: Absolutely. Will do, your Honor.

I think your Honor's comment right there just sort of foreshadows something that I'm about to say next.

THE COURT: What are you about to say next?

MR. UDELL: I'm about to move on to a couple of other paragraphs, 79 and 80, in the presentence report seized upon by the government. And, again, I don't fault the government for

saying what they did in light of what was in the report, but we believe the report is mistaken when it talks about his cooperation with respect to getting financial information.

So turning to paragraph 79, the PSR says that Mr. Truglia did not disclose the name of the bank or financial institution where he maintains a checking account and has not submitted documents for that account. If you look at the top of paragraph 78 where it lists his assets, you see that checking account is there. It's the $648.72 asset that we're talking about here now. The fact is that Mr. Truglia did disclose exactly that, the name of the institution on his financial disclosure form. We have the form. It was e-mailed to the Probation Office with the name of the bank.

THE COURT: So you say you have given the name of the bank?

MR. UDELL: Yes, that was given before this.

THE COURT: What is the name of the bank?

MR. UDELL: TD Bank, N.A.

THE COURT: And you submitted documents for this account?

MR. UDELL: To that point, your Honor, respectfully, we do not have any record, to our understanding, of getting a request as follow-up after we disclosed the name for those documents until this PSR comment came out.

THE COURT: When did you see the PSR come out?

MR. UDELL: The PSR came out in June. But we understood we were going to come into sentencing and we were going to address the comments at sentencing. In other words --

THE COURT: This is supposed to come to me for the purposes of sentencing.

MR. UDELL: Correct.

THE COURT: So information that is withheld because of imminence of sentencing doesn't help me.

MR. UDELL: Your Honor --

THE COURT: I want the information.

MR. UDELL: And, your Honor --

THE COURT: I want the information; do you understand, Mr. Udell? I want the information.

MR. UDELL: And I would love to give it to you, and we will, your Honor.

Can I say, your Honor --

THE COURT: Why wasn't it provided now?

MR. UDELL: I'll tell you exactly --

THE COURT: Or before now?

MR. UDELL: Because, to my understanding, this was something that was going to come up at sentencing.

THE COURT: That is no excuse, Mr. Udell. You've been around here a long time.

MR. UDELL: I have, your Honor. And to that point, I've not had occasion to, after the PSR, to sort of make a sort

of surrebuttal kind of commentary on the PSR until the report.

Your Honor, your Honor's point is well taken and, respectfully, we would like the opportunity——and I'm going to say again in a minute when we get to these other items——to make a submission on these things that we did not know were outstanding because they weren't asked for.

THE COURT: You knew, Mr. Udell, because the law provides that you get an advance copy of this PSR. And so you knew from the advanced copy these statements, right?

MR. UDELL: Respectfully, your Honor, I don't believe that in the advanced copy they made the points that you're making, that we're addressing here. In other words, in the advanced copy, it didn't point these things out. We believe we gave them everything that was asked for.

THE COURT: When were you asked these questions by the Probation Office?

MR. UDELL: I don't believe we ever were. That's our point. In other words, we submitted the bank account information, TD Bank, with his financial disclosure. And then at no time in our memory -- and, Judge, I'm going to say this on behalf of myself and my firm, if we were asked, it's our oversight, and I am ashamed, and I apologize for that. But to our knowledge and understanding, there's certainly no reason why we wouldn't have produced that if we were asked. That's my point, that these things didn't come out or we didn't see them

until we saw the final report. That's the issue, your Honor. And I absolutely request the opportunity to submit it to your Honor.

THE COURT: Does the government have anything to say on this?

Sit. Take your mask off.

MR. CAPOZZI: Sure.

Your Honor, we identified these areas in our review of the PSR, which is why we called attention to them in our sentencing submission based on our reading of the final PSR. These materials were not provided, as requested by Probation, by the defense.

THE COURT: When was the defense asked?

MR. CAPOZZI: When, your Honor?

THE COURT: Yes.

MR. CAPOZZI: Your Honor, I do not know. It's not clear from the face of the report.

THE COURT: Did you see the preliminary version of this report?

MR. CAPOZZI: I did, your Honor.

THE COURT: Do you happen to have it with you?

MR. CAPOZZI: I only have the final report, your Honor, with me.

Your Honor, we spoke with defense counsel yesterday when they explained their efforts to collect some of this

information. And of course if your Honor wishes to have this information available to it in order to sentence the defendant appropriately, we wouldn't object to the defense having the opportunity to provide that to you.

THE COURT: I want all these questions answered.

MR. UDELL: Your Honor, we welcome the questions and would be answer to happy to answer them, truly, your Honor. We did not understand -- and I can tell you as an officer of the court that I didn't understand that there was anything outstanding that was specifically required that we were not getting.

It may very well be, your Honor, if we can't get it, we'll say we can't get it. But with respect to the things I've mentioned so far——and there are one or two others that I will get to if your Honor would like to hear them now——I just don't have a record of us being asked for them expressly.

THE COURT: This final PSR has a date of June 28.

MR. UDELL: Yes, your Honor.

THE COURT: That's three months ago.

MR. UDELL: It is. Sentencing in this case was supposed to be I believe in July, originally.

THE COURT: So you've had all the time since June, assuming you can get it before, which I doubt. But you had all this time in June to correct this and to get the information.

Why didn't you?

MR. UDELL: Your Honor, again, I apologize. It's, I think, it's one of procedure, meaning I didn't --

THE COURT: That's nonsense, Mr. Udell.

MR. UDELL: Your Honor, I didn't understand that there was a surrebuttal. We issued our comments to the preliminary --

THE COURT: Mr. Udell, you're a careful lawyer. You don't allow these things to go unchallenged unless you don't want to give the information, unless you hope that this will slip by the judge. Get the information on the adjourned date or there will be something to pay for.

MR. UDELL: Will do, your Honor, absolutely. And I welcome the opportunity. And I apologize to the Court.

THE COURT: I'm glad you welcome the opportunity.

You know, the acceptance of be responsibility must be clear. Part of the issue of accepting responsibility is to make repayment to the person who was the victim of a theft. And if you can't get the information, the judge can't give a proper response.

MR. UDELL: That's fair, your Honor.

THE COURT: You know that.

MR. UDELL: Understood, your Honor.

THE COURT: I'm looking at page 15, paragraph 71 of the initial PSR, filed December 13, 2021, eleven months ago. ECF 45, paragraph 71 provides: Additional information is

awaiting for two years since his financial statement did not indicate whether he owns any real estate property, or motor vehicles, or provided the detailed account of the jewelry and art owned by the defendant. Financial statement also did not reflect where Truglia maintains his cryptocurrency. The defendant did not reflect in his financial statement how he covers his monthly --

MR. UDELL: Your Honor, I believe every single one first of all, none of those things, they don't mention the bank account that I was talking about here. That's not listed in there.

THE COURT: I've heard enough, Mr. Udell. I've heard your comments, and I've drawn various conclusions that are pretty evident to me.

MR. UDELL: Well, your Honor, two things. I do have some other remarks.

THE COURT: I'll hear them.

MR. UDELL: Okay. So a question whether your Honor would like to hear them now or --

THE COURT: I would like that hear them now, yes.

MR. UDELL: Okay.

THE COURT: The next thing is paragraph 80.

MR. UDELL: I have more on paragraph 79, your Honor. And I will get to 80. That's the other one.

But on 79, first——and this is references something

that your Honor just read there——it says that that the defendant maintains his Bitcoin, and they give a wallet name, but they said he has not specified where the wallet is maintained. And as it turns out, we did tell the Probation Office that the cryptocurrency was stored in online wallets. In other words, he didn't say if it's online or a cell phone or a USB. And we do have an e-mail where we told the probation officer that it was, in fact, stored online. There's another --

THE COURT: When what does that mean? It means you need to give the number so that the account can be accessed. It means that you have to give the substantive information in reliable form to the probation officer.

MR. UDELL: And, again, your Honor, we told him, at his request, that it was online. So contrary to what this says here, had he said, okay, I need to see a printout or statement from it, we could have undertaken to try to do that. That was not asked for, your Honor. that's the point.

THE COURT: What is fairly asked and what I now make clear is I want to know what are the assets, where are they located, and how do we get access to them?

MR. UDELL: Understood, your Honor. And that came in a supplement for the first time.

THE COURT: Because they're going to be enjoined.

MR. UDELL: I'm sorry.

THE COURT: They're going to be enjoined unless there's a compliance with the restitution.

MR. UDELL: Understood, your Honor.

I mean, your Honor, can I --

THE COURT: I'm not kidding around with this, Mr. Udell. You've got a lot at stake here. You've got a finding whether there's clear acceptance of responsibility. You've got, at hand, a possible variance above the sentencing guidelines within the limits of the statute. I would not fool around with this.

Do you understand me?

MR. UDELL: Understand, your Honor. Perfectly clear, your Honor.

THE COURT: That goes with jewelry.

MR. UDELL: Actually, before we --

THE COURT: That goes with luxury watches. It goes with art. It goes with anything of value. I'm not going to fence with you on the words of these things. You now have it clear, anything of value must be fully disclosed, any liens, indemnities on it, anything that the Probation Office needs to know to make a report to me so that I can fully assess Mr. Truglia's ability to make restitution, perhaps immediately.

MR. UDELL: Understood, your Honor.

THE COURT: I also want to find out if there's any relationship between the default judgment suffered by

Mr. Truglia by Mr. Turpin in the Los Angeles Superior Court. There's a $75 million default judgment here.

MR. UDELL: I'm sorry, your Honor. I didn't hear what your Honor said about that.

THE COURT: Is there any relationship between that default judgment of $75 million?

MR. UDELL: And this case?

THE COURT: Yes.

MR. UDELL: Yes. To my understanding, the default judgment is based -- the 75 million number is, your Honor, a treble damage, a three times multiplier from a civil lawsuit commenced by Mr. Turpin while Mr. Truglia was incarcerated in California. And so the facts of this case multiplied by three is that civil lawsuit. And the default which Mr. Turpin achieved was when Mr. Truglia was incarcerated in California and did not have counsel and did not appear in the case. And he got that default judgment while Mr. Truglia was incarcerated based on these facts.

THE COURT: If he pays up the judgment, will there be any need for restitution in this case?

MR. UDELL: I don't believe so, your Honor. I mean, if -- oh, I'm sorry. If he pays the default judgment?

THE COURT: Yes.

MR. UDELL: There certainly would not be. That would be three times the restitution recovery. It will be a three

times recovery.

THE COURT: And if we eliminate the treble and he pays the default judgment, is there anything left in this case?

MR. UDELL: To my knowledge, your Honor, absolutely not.

THE COURT: Does the government have any insight?

MR. CAPOZZI: Your Honor, if the defendant pays 25 million of that 75 million, I do not believe that there would still be any outstanding restitution amount.

THE COURT: All right. Well, I think you need to get into the superior court and open up that default. Because as it is, it's going to impact sentencing.

How much time do you need to get this information?

MR. UDELL: May I have just one moment, your Honor?

(Counsel confer)

MR. UDELL: Your Honor, we'd respectfully request two weeks, just to be conservative in terms of setting a date. But as soon as the information comes in sooner than that, it will be supplied.

THE COURT: Bridget, can we adjourn this to December 30 at 2:15?

MR. CAPOZZI: Your Honor, I would just respectfully note that I have a planned vacation that week.

MR. UDELL: Actually, me, too, your Honor.

THE COURT: Okay. The following week.

MR. UDELL: The first week in January, your Honor.

THE COURT: The first week in December.

MR. UDELL: Wait. Did you say November 30 or December 30?

THE COURT: I don't know what I said, but I meant November 30.

Can you make that?

MR. CAPOZZI: That week would be fine, your Honor, the last week in November.

THE COURT: And you can make that, Mr. Udell?

MR. UDELL: Yes.

My calendar is freezing up on me. Is that a Friday, everybody?

THE COURT: No. It's a Wednesday.

MR. UDELL: Okay. Hold on one second, your Honor. I apologize.

Yes, I can make that date, your Honor.

THE COURT: Bridget, November 30, 2:15.

THE DEPUTY CLERK: Yes.

THE COURT: Okay. When will you get the information to the government and to the Court?

MR. UDELL: As soon as we have it, your Honor.

THE COURT: I know. What date should I give? November 23?

MR. UDELL: Sure, yes, Your Honor.

THE COURT: The day before Thanksgiving.

MR. UDELL: Yep.

THE COURT: Noon.

Make sure your client realizes it's a meaningful date, because I'm not going to adjourn it. If you need more time, I'll give it to you now, but ask your client if everything can be done by November 23.

MR. UDELL: Understood. Those dates are fine, your Honor.

THE COURT: Okay. We're adjourned to November 30.

MR. CAPOZZI: Thank you, Judge.

MR. UDELL: Thank you, Judge.

THE COURT: Shall I sign the order of restitution?

MR. UDELL: Your Honor, we'd respectfully request that we wait until the next date.

THE COURT: Okay.

MR. UDELL: Your Honor, if I may, there's one issue with respect to the amount of restitution.

THE COURT: Sit down, everybody.

MR. UDELL: So as your Honor knows, obviously, the amount of restitution that Mr. Truglia will owe is really a function of two separate numbers. One, what the loss amount was originally discounted by amounts that Mr. Turpin has been repaid already to lower the loss. And it's with respect to that latter amount——in other words, how much he's

received——that there's a question.

And we talked about this in our submission, but Mr. Turpin has acknowledged receiving a certain amount of Bitcoin from the leader of this conspiracy, as well as a watch, an expensive watch. So it's valuing that, those assets. That is the question. And by question, I mean, if Mr. Turpin still has that Bitcoin that he's acknowledged was given to him in partial satisfaction of the amounts taken by this conspiracy, depending on whether he sold it -- if he sold it, how much he got for it. Or if he still has it, there's a great variation and variability in terms of how much he's been recompensed for the crime.

THE COURT: Mr. Turpin, do you have a lawyer?

MR. TURPIN: I believe he should be on the call or there.

THE COURT: Is your lawyer on the call?

MR. TURPIN: Neil or Paul, are you on the call?

I thought they would be on the call. I am represented, yes.

THE COURT: All right. Your ability to get your money back, Mr. Turpin, requires you to be open with counsel here, both the defense counsel and the government, to make a convincing showing of what you received in relationship to your debt. You can't be --

MR. TURPIN: Understood. And that is all in the

documents, what was received. I was going to see who --

THE COURT: Well, Mr. Udell will meet with your lawyers and apprise the government, unless the government wants to be there at the meeting. And so any controversy should be identified and, if necessary, brought to me.

MR. TURPIN: Thank you.

THE COURT: My intention is to have you paid very soon after the closing of this case, soon after the sentence. And willingness to pay a just debt is going to be an indication of acceptance of responsibility.

MR. TURPIN: I understand and appreciate that, your Honor.

THE COURT: All right. Do you want to make things easier also, if you get paid the full amount that you're owed, you might be willing to discharge the default judgment in a much larger sum.

MR. TURPIN: I would be willing to do that, your Honor.

THE COURT: Yes. You're not going to get restitution for punitive damages.

All right. Folks, thanks very much. We're recessed until November 30.

MR. UDELL: Thank you, Judge.

MR. CAPOZZI: Thank you, Judge.

(Adjourned)