

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 9, 2024

**BY ECF:**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re: *United States v. Truglia*, 19 Cr. 921 (AKH)

Dear Judge Hellerstein:

  The Government respectfully writes in response to the defendant's opposition to resentencing. (Dkt. 99 ("Def. Ltr.")). The Court can and should exercise its statutory authority to order a resentencing of the defendant for his knowing and willful failure to pay any amount of restitution.

**I.** **The Court Has the Authority to Resentence the Defendant**

  A fine or payment of restitution is delinquent if a payment is more than 30 days late. 18 U.S.C. § 3572(h). A fine or payment of restitution is in default if delinquent for more than 90 days. 18 U.S.C. § 3572(i). Pursuant to Title 18, United States Code, Section 3613A(a)(1):

> *Upon a finding that the defendant is in default on a payment of a fine or restitution, the court may*, pursuant to section 3565, revoke probation or a term of supervised release, modify the terms or conditions of probation or a term of supervised release, *resentence a defendant pursuant to section 3614*, hold the defendant in contempt of court, enter a restraining order or injunction, order the sale of property of the defendant, accept a performance bond, enter or adjust a payment schedule, or take any other action necessary to obtain compliance with the order of a fine or restitution.

18 U.S.C. § 3613A(a)(1) (emphasis added). Section 3613A(a)(2) further provides that in determining what action to take under Section 3613A(a)(1), "the court shall consider the defendant's employment status, earning ability, financial resources, the willfulness in failing to comply with the fine or restitution order, and any other circumstances that may have a bearing on the defendant's ability or failure to comply with the order of a fine or restitution."

Section 3614(a) states that if "a defendant knowingly fails to pay a delinquent fine or restitution the court may resentence the defendant to any sentence which might originally have been imposed." 18 U.S.C. § 3614(a). Section 3614(b), however, adds an additional requirement before a court may resentence a defendant to imprisonment. Pursuant to Section 3614(b)(2), a court may do so if the court determines that "in light of the nature of the offense and the characteristics of the person, alternatives to imprisonment are not adequate to serve the purposes of punishment and deterrence." Section 3614(b)(1) offers an alternative path to imprisonment in the case of a delinquent fine—in that situation, a court may also imprison if "the defendant willfully refused to pay the delinquent fine or had failed to make sufficient bona fide efforts to pay the fine." The statute has no similar alternative path where, as here, the issue is restitution. *See United States v. Bengis*, 03 Cr. 308 (LAK), Transcript of July 19, 2017 Hearing, attached as Exhibit A, at 29 ("[T]he plain language of the statute seems to indicate that imprisonment may be imposed for knowing failure to pay restitution, and that a finding of willfulness is not necessary for that purpose."). Nevertheless, at least one court has acknowledged the possibility that an appellate court presented with the question might interpret the statute to include a requirement of willfulness in a case involving failure to pay restitution. *Id.* (noting "the possibility that a higher court might take a different view of [Judge Kaplan's] reading of the statute"). The Second Circuit does not appear to have made a definitive ruling on the question. *Compare United States v. Hurtado*, 756 F. App'x 63, 68 (2d Cir. 2018) ("[I]mprisonment for failure to pay restitution is permitted only if a defendant 'willfully refused' *or* 'failed to make sufficient bona fide efforts to pay,' *or* else 'alternatives to imprisonment [would not be] adequate to serve the purposes of punishment and deterrence.'" (emphasis added)), *with United States v. Rutigliano*, 887 F.3d 98, 107 (2d Cir. 2018) ("[O]nly a willful failure to pay restitution can result in incarceration."), *and United States v. Colasuonno*, 697 F.3d 164, 180 (2d Cir. 2012) (upholding Your Honor's decision to revoke probation for a "willful violation" of restitution obligations).

Nothing in the statutory text indicates that the Government has any role in whether a court may exercise the court's substantial authority explicitly granted to it by statute in Sections 3613A and 3614, including its authority to resentence. Indeed, the statutory scheme suggests the opposite. For example, among other enforcement options listed in Section 3613A(a)(1), where the court makes a finding of default, a court may revoke a term of supervised release. Revocation proceedings are initiated by the Court (via the Probation Office), not the Government. Thus, the statute contemplates that following a revocation hearing initiated by a court at which the court finds that a defendant is in default on a payment of restitution, the court may choose to revoke the term of supervised release *or* the court may choose one of the other enforcement options outlined in the statute, including resentencing. Indeed, Your Honor appears to have done just that in *Colasuonno*. In *Colasuonno*, the Court issued a summons for the defendant in that case "to appear and to answer the charge that he had violated his probation by failing to make a good faith effort to pay restitution." *Colasuonno*, 697 F.3d at 170-71. After an evidentiary hearing, the Court found the defendant in violation of probation. *Id.* at 171. After affording the parties an opportunity for briefing and oral argument, the Court revoked the defendant's probationary sentence and resentenced the defendant to a term of imprisonment. *Id.*

The defendant continues to fail to identify any authority that suggests the Court cannot initiate a resentencing proceeding. Instead, the defendant cites a collection of cases that support the unremarkable fact that the Government *may* ask a court to exercise the authority granted to the

court in the relevant statutes. This makes sense—it will often be the Government that will first become aware of circumstances that may merit a resentencing and bring those circumstances to a court's attention. That practice does not somehow remove a court's statutory authority to act on its own.

In any event, even if the Court could not initiate resentencing on its own, there is no reason why the Government cannot now ask the Court to resentence the defendant. *Cf. United States v. Peterson*, No. 2:08-MJ-16, 2010 WL 1052336, at *4 (D.N.D. Mar. 19, 2010) (ordering sale of property to satisfy restitution and fine obligations, pursuant to 18 U.S.C. § 3613A(a)(1), following hearing on alleged probation violations, where the Government initially moved for modification of probation conditions and then, at the hearing, requested permission to sell the property). As detailed in the Government's letter dated November 17, 2023, (Dkt. 98), the Government has repeatedly alerted the defendant regarding the possibility of a resentencing, and, as the Court has recognized, the Government never agreed not to seek resentencing. (*See* Tr. 209 ("There was no agreement")).[1] Moreover, the defendant continues to fail to identify any prejudice from proceeding with a resentencing now. Accordingly, to avoid any doubt and for the reasons set forth below, by this letter, the Government moves for resentencing.

## II. The Defendant Has Knowingly and Willfully Failed to Pay Restitution

There is no dispute that the defendant is in default on his payment of restitution—his payments have been due for nearly a year and yet he has made no payments. In addition, the record before the Court amply establishes that the defendant's failure to pay restitution has been both knowing and willful.

"An act is done knowingly and willfully if it is done deliberately and voluntarily, that is, the defendant's act or acts must have been the product of his conscious objective, rather than the product of a mistake or accident or mere negligence or some other innocent reason." *United States v. Kozeny*, 667 F.3d 122, 135 (2d Cir. 2011) (affirming district court jury instructions).

There is no dispute that the defendant was keenly aware of his obligation to pay restitution. Indeed, his ability and willingness to pay restitution was a primary focus of the sentencing proceeding, which spanned three court appearances (on November 2, November 30, and December 1, 2022); included a restitution order signed by the defendant that was reviewed in detail in open court; and culminated in the defendant receiving a lower sentence that he would otherwise have received because of his commitment to pay back his victim in short order. Furthermore, a few weeks after sentencing, on or about December 27, 2022, the defendant signed a settlement agreement with the victim, in which the defendant promised to pay the full restitution amount to the victim in Bitcoin on or before December 30, 2022. (GX 48).[2] And the defendant's Probation Officer discussed the obligation with the defendant more than five times, during which discussions

---

[1] "Tr." refers to the hearing transcript; "GX" refers to a Government hearing exhibit;

[2] The restitution order required payment of restitution in two installments, with the first payment due on or before December 31, 2022, and the second payment due on or before January 30, 2023. (*See* GX 47).

the defendant repeatedly signed documents that detailed his obligation. (*See* Tr. 3-9; GX 33 ("Financial Agreement Payment Instructions" signed by the defendant on January 11, 2023, and February 6, 2023); GX 32 (Letter from Government signed by the defendant on April 11, 2023)).

The evidence establishes that, despite this knowledge, the defendant deliberately and voluntarily chose not pay restitution. Importantly, the Court can and should make such a finding regardless of its view of the Bitcoin the defendant claims he is unable to access, which Bitcoin is discussed below in Section III. Even setting aside that Bitcoin, the evidence shows that the defendant had assets to make restitution payments but chose not to do so.

First, between January 26 and February 24, 2023, the defendant transferred over $220,000 into a Wells Fargo bank account that he did not disclose to the Probation Department in a financial disclosure form signed by the defendant under penalty of perjury. (*See* Tr. 35-36; GX 49; GX 30). The defendant used much of the money to buy luxury items (from, among others, Louis Vuitton, Bape, and Supreme), fund his brokerage account, and make transfers to cryptocurrency exchanges. (*See e.g.*, Tr. 40-41; GX 49). The defendant could and should have used that money to pay restitution. He chose not to.[3]

Second, before and after sentencing the defendant reported holding substantial amounts of non-Bitcoin digital assets, including other forms of cryptocurrency and digital art (*i.e.*, non-fungible tokens or "NFTs"). Four months after sentencing, on March 27, 2023, the defendant reported owning over $382,000 in Zcash. (GX 30 at 4 (financial disclosure form); *see also* Presentence Investigation Report dated Dec. 22, 2022 ("Final PSR") ¶ 78 (reporting $426,373 in Zcash); GX 43 (image sent by defendant to Bennett Genovesi on January 6, 2023, showing account holding $424,689 worth of Zcash)). In addition, shortly before sentencing, the defendant reported having over $8 million worth of Ethereum, XMR Monero, and Cardano (all forms of cryptocurrency). (Final PSR ¶¶ 78-79).[4] Also, at sentencing, the defendant reported owning 34 NFTs, with a combined worth of over $763,500. (Final PSR ¶¶ 78, 83-84).[5] The defendant could and should have used these assets to pay restitution but chose not to.

---

[3] The over $220,000 included revenue from the sale of a luxury watch and transfers into the defendant's Wells Fargo account from multiple cryptocurrency exchanges. (*See* GX 49). The Government continues to attempt to trace the origin of the funds, an endeavor that is difficult given the nature of cryptocurrency.

[4] At sentencing, defense counsel claimed that the defendant no longer had these three assets but that the defendant "can't account for precisely where that went, but it's either expenses or exchanged for other assets [in the PSR]." (Dkt. 65 (Transcript of Nov. 30, 2022 Sentencing) at 6). The Court did not accept that vague accounting. (*Id.*). As with the Zcash, the defendant's Ethereum, XMR, and Cardano holdings were separate from the Bitcoin held in the wallet the defendant alleges is his and cannot access. As the parties stipulated, the Bitcoin in that wallet was transferred into the wallet on April 24, 2021, over one and a half years before sentencing, and has not moved since. (*See* GX 63).

[5] A few months after sentencing, on March 27, 2023, the defendant reported to Probation that he owned only $27,800 worth of NFTs. (*See* GX 30 at 7). The purported drop in value of the

Third, the defendant said he had the money. On January 9, 2023—that is, after the defendant was released from serving his sentence—the defendant texted Genovesi that the defendant did not need a job because he did not "need money," he was "good for a while," and had "eight figures," in other words, at least $10 million. (Tr. 125-26: GX 53 at 11).[6] The defendant chose not to use any of that money to pay back the victim.

Fourth, the defendant is a sophisticated cryptocurrency thief. In this case, the defendant and his co-conspirators stole over $20 million worth of cryptocurrency during a single hack. The evidence in the underlying case included electronic communications and post-arrest statements about his participation in other heists. The evidence also included photographs taken before the defendant's arrest that reflected a luxury lifestyle, involving private jets, diamond-encrusted jewelry, bottles of expensive liquor, and stacks of cash and devices used to store cryptocurrency.

In light of the above—and regardless of the Court's view of the Bitcoin the defendant claims he is unable to access—there is ample basis to conclude that the defendant continues to have and hide substantial assets available to him to pay restitution. Furthermore, contrary to the defendant's claims, there is no requirement that the Court find that the defendant has the current ability to pay the entire restitution amount. (*See e.g.*, Def. Ltr. at 5). The statute does not include such a requirement. Section 3614(c) says that a court may not incarcerate a defendant "solely on the basis of inability to make payments because the defendant is indigent." Even if there was reason to conclude that the defendant is currently indigent—which there is not—the Court could and should conclude, based on the evidence outlined above, that the defendant did not make restitution payments when he could do so and therefore may be resentenced. A defendant cannot evade justice simply by dissipating assets on luxury items. *See United States v. Vitek Supply Corp.*, 151 F.3d 580, 584 (7th Cir. 1998) (rejecting argument that it was "too late for the district judge to do anything in response" to a defendant's efforts "to make itself judgment-proof," noting that Section 3613A(a)(1) grants courts "authority to deal with defendants that thumb their noses at criminal fines"); *see also United States v. Kestenbaum*, 908 F. Supp. 2d 364, 369 (E.D.N.Y. 2012), *aff'd and remanded*, 552 F. App'x 74 (2d Cir. 2014) ("The test for revocation of probation under *Bearden* is not whether the probationer is indigent, but rather whether the probationer 'has made all reasonable efforts to pay . . . .'" (quoting *Bearden v. Georgia*, 461 U.S. 660, 668 (1983)). Likewise, a defendant who owes over $20 million is not off the hook just because he may presently have access to only $10 million (or one million or hundreds of thousands).

---

defendant's NFT collection during the time the defendant was obligated to pay restitution is unexplained.

[6] The defendant's claim that he did not need a job is corroborated by his failure to seek or gain employment after serving his sentence and by his disregard of his Probation Officer's directions concerning the same. (*See* Tr. 13-18; GX 25; GX 26 (reflecting that the defendant's job search did not begin until March 29, 2023)).

**III.    The Defendant's Story About the Bitcoin is Not Credible**

As for the Bitcoin, the weight of the evidence suggests an elaborate scheme devised by the defendant to deceive and distract the victim and the Court.  First, the defendant's claims concerning the location of the Bitcoin and the reasons for his inability to access it have changed over time.  At sentencing, the defendant initially reported that the Bitcoin was stored online.  (Dkt. 57 (Transcript of Nov. 2, 2022 Sentencing) at 13).  The defendant then claimed that it was stored in a "Bitcoin wallet."  (Final PSR ¶ 79).  After sentencing, the defendant initially told his Probation Officer that he needed something in a storage locker to gain access to the Bitcoin and then later said he needed to get information from his friends in New York.  (*See* Tr. 4).

Second, the defendant repeatedly refused to provide information that could corroborate his story.  He did not provide the full name or contact information for "Scott," the person the defendant claimed was present with him when the defendant initially gave one set of seed words to Genovesi in December 2021 and later accompanied the defendant in an attempt to get those seed words from Genovesi in April 2023.  (Tr. 65-67, 80).  He did not allow the victim's lawyer to attend or observe his purported meetings with the two other friends in New York at which he claimed to have collected the other two sets of seed words.  (Tr. 67-74).  And he refused to provide the names or contact information of those friends, which would have allowed the victim's lawyer to interview the friends (and the Government the ability to subpoena them).  (*Id.*).

Third, information the defendant did provide was not true and intentionally falsified.  The defendant claimed that he obtained the Bitcoin during an over-the-counter transaction with Kraken, a cryptocurrency exchange.  (*See* Tr. 75-76).  According to Kraken, however, the defendant was not their client and any transaction of the sort claimed by the defendant would not have happened in the manner he described.  (*See id.*).  Furthermore, in an attempt to buttress his story, the defendant gave the victim's lawyers a fraudulent trade confirmation.  (*See* Tr. 81-85; GX 36; GX 37; GX 59).  In addition, other information the defendant provided—for example, the public key for the wallet he claimed was his and the number of Bitcoin in the wallet—was available to anyone who, like the defendant, had access to the Internet, wanted to look up the list of richest Bitcoin wallets, and then claim the wallet was theirs.  (*See* GX 63).

Fourth, the defendant's account is contradicted by the testimony under oath of Genovesi, which was corroborated by documentary evidence.  Genovesi testified that he never got a hard drive from the defendant or any seed words.  (Tr. 110-11).  That testimony was corroborated by an email in which the defendant asked Genovesi for the defendant's jewelry but not any hard drive or seed words.  (GX 40).  It was corroborated by text messages in which the defendant asked Genovesi for months about the defendant's jewelry but never mentioned a hard drive until April 8, 2023, (GX 44; *see also* Tr. 131), the same day on which the defendant told the victim's counsel the story about giving Genovesi a hard drive.  (Tr. 80).  The testimony is also corroborated by text messages between Genovesi and the defendant's father, which include no mention of any missing hard drive or thumb drive.  (*See* GX 42).[7]

---

[7] Genovesi's account of the April 2023 incident during which the defendant and someone named "Elvis" searched Genovesi's apartment is also corroborated by documentary evidence.  (*See* Tr. 127-32).  Genovesi testified that he saw the defendant make a Zelle payment to "Elvis" that

Fifth, the defendant has a history of lies that substantially undermine his credibility. In or around December 2021, he lied to his Pretrial Services Officer concerning an incident at his home in Florida, which led to his remand for violating pretrial release conditions. He signed a financial disclosure form that did not disclose his Wells Fargo account. (GX 30). He lied when his Probation Officer asked him about his job search. (Tr. 18). He gave the victim's attorneys a fraudulent trade confirmation. (*See* Tr. 81-85; GX 36; GX 37; GX 59). He gave a cryptocurrency exchange a doctored bank statement. (GX 50; GX 51).

Finally, the defendant's account is incredible on its face. The defendant's claim appears to be as follows: he owns a wallet containing 3,196.1675 Bitcoin, which is currently worth about $140 million; he transferred the Bitcoin into that wallet on April 24, 2021 (at which point the defendant was represented by Federal Defenders because he was purportedly unable to afford a lawyer) and has not touched it since, (*see* GX 63); he did not check whether he could access the Bitcoin before he repeatedly promised to pay restitution, although he knew at the time that he needed either to find a small device he thought was in a storage locker in Florida or get three sets of seed words from three different people; he searched the storage locker, which he thought might contain what he needed to access approximately $140 million worth of Bitcoin for "three hours" on January 13, 2023 before giving up, (*see* Tr. 23); he then waited several months, until April 2023, to try to get the seed words from three individuals in New York; he was able to meet and get seed words from two of these individuals within a few hours; and the only thing standing between him and about $140 million worth of Bitcoin is Genovesi, a night club manager the defendant used to party with, who he hurriedly gave the last set of seed words to on a hard drive after a night of partying in 2021 but who he never asked about the hard drive until April 2023. This account is entirely nonsensical and should be rejected by the Court.

In sum, there is ample basis to conclude that the defendant deceived this court at sentencing and re-victimized the victim by offering the hope of timely restitution and instead strung the victim along with a fantastical tale composed of lies all the while moving substantial sums of money into an undisclosed account and purchasing luxury items. The Court should order a resentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Timothy V. Capozzi
Assistant United States Attorney
(212) 637-2404

cc:   Mark Gombiner, Esq. (by ECF)

---

evening. (Tr. 132). The defendant's bank records reflect such payments to someone named "Elvis" on April 6 and 7, 2023. (*See* GX 14 at 38).