O2T1TRUA

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          19 Cr. 921 (AKH)

5    NICHOLAS TRUGLIA,

6              Defendant.                  Oral Argument
     ------------------------------x

7
                                           New York, N.Y.
8                                          February 29, 2024
                                           11:14 a.m.
9

10   Before:

11                   HON. ALVIN K. HELLERSTEIN,

12                                         District Judge

13
                         APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  TIMOTHY A. CAPOZZI, ESQ.
          Assistant United States Attorney
17
     FEDERAL DEFENDERS OF NEW YORK INC.
18        Attorneys for Defendant
     BY:  MARK B. GOMBINER, ESQ.
19        CHRISTOPHER A. FLOOD, ESQ.

20

21   ALSO PRESENT:  PIERCE O'DONNELL, ESQ.

22   ALSO PRESENT:  MICHAEL MALEAKA, U.S. Probation Officer

23

24

25

O2T1TRUA

1           (Case called)

2           THE DEPUTY CLERK:  Counsel, please state your

3    appearances for the record.

4           MR. CAPOZZI:  Good morning, your Honor.  Timothy

5    Capozzi for the United States.  With me at counsel table is

6    United States Probation Officer Michael Maleaka.

7           THE COURT:  Good morning.

8           MR. MALEAKA:  Good morning.

9           MR. GOMBINER:  And Mark Gombiner and Christopher

10   Flood, Federal Defenders, for Mr. Truglia.  Good morning,

11   Judge.

12          THE COURT:  Good morning.

13          We've had and we've completed evidence on the problems

14   arising from the failure of Mr. Truglia to give restitution.

15   Since that time, Mr. Gombiner argued that that proceeding was

16   limited to the failure of paying restitution, and whatever

17   adjustment that would require in supervised release.  I held

18   the hearing, and the government moved for resentencing.  And I

19   gave Mr. Gombiner an opportunity, after the hearing, to bring

20   whatever evidence he felt would be useful with regard to

21   resentencing that had not been fully presented with regard to

22   restitution.  There was nothing more added.

23          Finally, the government has made an order to show

24   cause to punish by contempt.  Mr. Gombiner has objected.  So

25   before we go to anything else, we should take that motion up.

O2T1TRUA

1          Mr. Capozzi, would you speak in favor of the motion.

2          MR. CAPOZZI:  Your Honor, would you prefer that I stay

3    seated or stand?

4          THE COURT:  I prefer you to go to the podium.

5          MR. CAPOZZI:  Your Honor, in our most recent papers,

6    we sought both a holding of contempt as well as a resentencing.

7    Your Honor, we did that because they serve different purposes.

8          THE COURT:  Sorry?

9          MR. CAPOZZI:  They serve different purposes.  The

10   contempt will hopefully finally cause the defendant to pay back

11   his victim.  Resentencing will help remedy the injustice of his

12   receipt of a sentence that was substantially influenced by his

13   false promise to pay restitution.

14         THE COURT:  If I were to grant your motion, the

15   consequence would be civil imprisonment until Mr. Truglia

16   purges this contempt—that is, makes restitution; is that

17   right?

18         MR. CAPOZZI:  Correct, or if there comes a time when

19   he establishes to the satisfaction of your Honor that he has

20   taken all reasonable steps available to him to satisfy that

21   obligation.

22         THE COURT:  And how does a resentencing play into

23   that?

24         MR. CAPOZZI:  Well, your Honor, I think the Court

25   could take different approaches.  I think that—

O2T1TRUA

1          THE COURT:  Let's suppose I want to do the contempt as

2     the only effective way of getting Mr. Truglia to pay his debt.

3     What happens to the resentencing?

4          MR. CAPOZZI:  I think there is nothing that would

5     prevent the Court from holding in abeyance any final

6     determination on the need for a resentencing to allow some time

7     for the contempt order to play out and see how it proceeds, and

8     if——

9          THE COURT:  So, for example, to defer resentencing

10    for, say, six months or such shorter period as is evident from

11    purging the contempt.

12         MR. CAPOZZI:  Correct, your Honor.

13         THE COURT:  And you've made the motion.

14         MR. CAPOZZI:  Correct.

15         THE COURT:  And no new facts need to be added to the

16    record; the record is full.

17         MR. CAPOZZI:  Correct, your Honor.

18         THE COURT:  Okay.  Mr. Gombiner.

19         MR. GOMBINER:  Well, let me address the suggestion

20    that the Court hold Mr. Truglia in contempt.

21         THE COURT:  I recognize your arguments of his good

22    faith, but let's assume that you don't persuade me as to that.

23    So there's really two questions: (1) do you have to add

24    anything for the record; (2) is the remedy appropriate?

25         MR. GOMBINER:  Well, Judge, I don't think the remedy

1    is appropriate because, one, I think Mr. Truglia, for at least

2    the last six months or so, has already been effectively under a

3    contempt order.  I mean, back in August of 2023, the Court

4    pretty much explicitly advised Mr. Truglia that if he paid the

5    restitution, he could get out of jail, okay?

6            THE COURT:  So what would be the argument against

7    continuing it?

8            MR. GOMBINER:  Because I think the record already

9    reflects that once Mr. Truglia was released from prison, he

10   made every effort he could to obtain the password to the

11   Bitcoin wallet.

12           THE COURT:  You're going to argue that in a few

13   minutes.

14           MR. GOMBINER:  Right.  But——

15           THE COURT:  So let's assume that argument fails.

16           MR. GOMBINER:  Right.

17           THE COURT:  It seems we have two arguments.  One is on

18   the merits, it shouldn't be given.

19           MR. GOMBINER:  Right.

20           THE COURT:  And second, there's no power to give it.

21   And I ask you to focus only on the latter.

22           MR. GOMBINER:  Well, Judge, I think the statute

23   authorizes contempt as a remedy when there's been a willful

24   failure to pay restitution.  But in this particular case, I

25   mean, it was clear at the time of sentencing that the

O2T1TRUA

```
1   restitution order, which specifically provides for two lump-sum
2   payments, one of about $12 million and one of about $8 million,
3   that money was to come from a Bitcoin account, from a Bitcoin
4   wallet.
5           THE COURT:  You're arguing the merits.
6           MR. GOMBINER:  Well, I'm trying not to argue.  It's
7   kind of hard to——
8           THE COURT:  Look, Mr. Gombiner, I'm going to give you
9   time to argue the merits.
10          MR. GOMBINER:  Okay.  That was just——
11          THE COURT:  The question now I want to deal with is
12  whether contempt is an available remedy if I agree with the
13  government.  That's the question I'm putting to you now.  And I
14  think you've answered that the statute provides for it.
15          MR. GOMBINER:  In this case I don't think contempt
16  really is an available remedy because I don't think there's any
17  evidence that Mr. Truglia has any ability to purge himself of
18  the contempt.
19          THE COURT:  Okay.  I understand your point.  It's
20  merits-oriented.
21          MR. GOMBINER:  Well, it is merits-oriented.  I mean,
22  if you're asking me in the abstract, do the laws provide for
23  contempt as a remedy for a failure to pay restitution, yes,
24  they do, okay, in this case, but I don't think that really gets
25  us that far.  I mean, yes, that's true, but it's sort of true
```

O2T1TRUA

1    in an unhelpful way.  The question I think you—I don't think

2    there's really any way to approach this except to say, if I

3    hold him in contempt, is there something he can do that will

4    purge the contempt, because if not, then you're just holding

5    him in jail just to punish him, which is not really an

6    appropriate use of civil contempt.

7            Let me just consult with my co-counsel for a second.

8            Okay.  With the assistance of my co-counsel here, just

9    with respect to whether the Court can institute an order of

10   contempt here, I mean, we have to start with, is there an order

11   that is clear and unambiguous, okay?  And I think the

12   restitution order here provides for two lump-sum payments.  And

13   for the government's motion for an order to cause to succeed,

14   they also have to show that the proof of noncompliance is clear

15   and convincing.  That's a legal standard.  That's not just on

16   the—I mean, maybe that gets to the merits in some sense, but

17   they do have to establish that.  And they have to establish

18   that Mr. Truglia has not diligently attempted to comply with

19   the order.  And I don't think they've established—I think

20   there's some question as to how clear the order is, but putting

21   aside that, there's no—one of the reasons I think the order is

22   possibly not that clear is most of the government's papers are

23   devoted to the idea that he didn't make some partial payments

24   towards restitution.

25           THE COURT:  We're going to get into the merits.

 1              MR. GOMBINER:  Okay.  But——

 2              THE COURT:  We're going to get into the merits.

 3              MR. GOMBINER:  All right.

 4              THE COURT:  So on the basis of this and pursuant to 18

 5     U.S.C. 3613(a), (a)(1), and 3614, I hold that contempt is an

 6     available remedy to obtain compliance with the order of

 7     restitution.

 8              MR. GOMBINER:  Okay.

 9              THE COURT:  So let's now get into the merits, and at

10     the end of that discussion, we can then return to the question

11     of what remedy or remedies are appropriate.  And I'll have

12     Mr. Capozzi lead on his argument on the merits.

13              MR. GOMBINER:  All right.  Thank you.

14              MR. CAPOZZI:  Your Honor, the Court's restitution

15     order is clear.  It was repeatedly reviewed by the defendant.

16     It was reviewed with him in open court.  It was reviewed with

17     him repeatedly by his probation officer.  There's no question

18     that it is clear and unambiguous.

19              He was legally obligated to pay back his victim in

20     total within 60 days, and he didn't do it.  He hasn't done it.

21     The proof of noncompliance is clear and convincing.  There's no

22     argument here that any payments have been made.  So there was

23     an order for him to pay, and he hasn't paid.  There's no

24     confusion that he has complied.  He hasn't.

25              Finally, the third element they cite is whether or not

1    the defendant has diligently attempted to comply in a

2    reasonable manner.  He has not, your Honor, which is amply

3    established by the record before the Court.  He has done the

4    opposite.  He has hidden assets, he has fabricated documents,

5    he has refused to provide corroboration, and he has made up a

6    story.

7            So, your Honor, the defendant is and was aware of his

8    obligation.  He chose not to pay his victim anything.  The

9    evidence shows that he had assets other than the Bitcoin that

10   he claims he is unable to access.  He had a Wells Fargo account

11   that he didn't disclose to probation, on a form that he swore

12   to under penalty of perjury, an account that he transferred

13   hundreds of thousands of dollars into.  The evidence shows that

14   he had other digital assets, substantial other digital

15   assets—Zcash, other forms of cryptocurrency, nonfungible

16   tokens.  Your Honor, the evidence establishes that he made

17   statements to, among others, Bennett Genovesi that he had eight

18   figures as of January of last year, which amounts to

19   $10 million.

20           Your Honor, the evidence establishes that this

21   defendant is a sophisticated cryptocurrency thief who

22   participated in the theft of over $20 million.  They want this

23   entirely to be about this fantastical—

24           THE COURT:  It should not be confused, Mr. Truglia's

25   crime, with stealing—how much money from the victim?

O2T1TRUA

 1          MR. CAPOZZI:  The conspiracy stole over $20 million.

 2          THE COURT:  And the order to repay was the repayment

 3    of the victim.

 4          MR. CAPOZZI:  Correct.

 5          THE COURT:  So first Mr. Truglia stole the money from

 6    the victim, then he got himself a lower sentence by promising

 7    to pay the victim in a very rapid time, and now he can't pay,

 8    or he doesn't want to pay.  That's the case, right?

 9          MR. CAPOZZI:  He has not paid.  He has had assets to

10    pay, and he has not used those assets to pay.  And the record

11    amply establishes that.  And that——

12          THE COURT:  He says he can't find the key.  He says

13    that in order to open up his cryptocurrency account, which is

14    said to contain $90 million, he needs three keys to then employ

15    his password.  He says he's committed the password to memory.

16    And he says that three people have the keys.  He tells a story

17    about going with Mr. McCarthy, the victim's lawyer, and

18    obtaining the key from the first confidant, and then from the

19    second confidant, but when he approached the third confidant,

20    Mr. Genovesi, the key could not be found.  We don't know what

21    physical appearance it had.  We don't know whether it was a

22    slip of paper or some kind of component.  He couldn't find it.

23    The circumstances are such as to create an argument on your

24    part that the failure was willful and on Mr. Gombiner's part

25    that it was innocent.  So I have to decide, willful or

1  innocent.  That's the issue.  I don't think there's a question

2  that the order of restitution was not paid.  It wasn't paid.  I

3  don't think there's a question that he had a clear obligation

4  for restitution.  It's embodied in a document filed in court.

5  I don't think there's any question that he obtained a lower

6  penalty, a lower term of custody because he promised

7  restitution.  It's in the record.  I don't think there's any

8  question that he himself proposed the schedule of repayment.

9  It's in the record.  So we have to decide, was Mr. Truglia

10  dishonest and willful in refusing to find, or not being able to

11  find, the third key, or was it innocent?  I'd like your advice

12  on that.

13       MR. CAPOZZI:  Even holding that aside for a moment,

14  your Honor, he was willfully not paying the other assets that

15  he had.  He doesn't say anything about those assets.

16       THE COURT:  So what does that mean?  Two things, I

17  think, I take from that.  Number one, being dishonest with

18  regard to various luxury items leads one to believe that he was

19  dishonest with regard to the issue of the key.  And number two,

20  if he had money, he could have paid it rather than indulging

21  himself with luxury hoodies and sneakers and jewelry.  Those

22  are two things I take, both of which argue for a finding of

23  willfulness.  Do you agree?

24       MR. CAPOZZI:  Absolutely, your Honor.

25       And with respect to the Bitcoin, the story is

1    incredible.  It's patently incredible.  I mean——

2            THE COURT:  Why so?

3            MR. CAPOZZI:  It has changed——

4            THE COURT:  Sorry.  Why?

5            MR. CAPOZZI:  It has changed over time.  What he said,

6    what he represented to Court versus what he represented to the

7    probation officer about where this Bitcoin was, has changed.

8    He refused to provide——

9            THE COURT:  What did he say about it in the first

10    instance?

11            MR. CAPOZZI:  He initially said it was online, and

12    then it was in a wallet, and then he needed information in a

13    locker, and then he needed passwords from some friends.

14            THE COURT:  He kept on adding facts.

15            MR. CAPOZZI:  It was always one more thing that

16    prevented him from making the payment.

17            THE COURT:  Yeah.

18            MR. CAPOZZI:  He refused to provide any corroboration

19    to the victim's lawyers, the names of these people who

20    apparently witnessed when he was distributing these sets of

21    seed words.

22            THE COURT:  He made Mr. McCarthy, the lawyer, wait on

23    the sidewalk while he went inside, spent 15 minutes, found

24    whatever he was looking for, and came back and said, ah, I've

25    got the first part of three parts, and did the same thing with

O2T1TRUA

1    the second part.

2            MR. CAPOZZI:  Correct.  He provided false

3    corroboration to them.  He provided a doctored trade

4    confirmation that purported to be from an entity that said,

5    this is not our record.  Another effort to convince his victim

6    that he was making a good-faith effort when he was not.  His

7    account is contradicted by witness testimony under oath.

8            THE COURT:  Which one?

9            MR. CAPOZZI:  Bennett Genovesi, who came here, swore

10   to tell the truth, and testified——

11           THE COURT:  Mr. Gombiner would say he's a thorough

12   liar.

13           MR. CAPOZZI:  Well, contrasted with the account of the

14   defendant, Mr. Genovesi's testimony was corroborated.  There

15   were emails and text messages that show no sign that the

16   defendant was ever trying to get any hard drive or password or

17   set of keywords from Bennett Genovesi until the point that he

18   told the story to the victim's lawyers.  There's hundreds of

19   text messages between the two talking about jewelry, going out,

20   this, that, the other.  There's nothing about, give me the

21   keywords so I can access my $140 million worth of Bitcoin.

22   Because he made that up.  That's corroborated testimony that

23   Bennett Genovesi offered.  Bennett Genovesi also testified

24   about, on the night when there was the incident at Bennett

25   Genovesi's apartment, seeing Mr. Truglia make a payment to

1    basically the muscle that he brought with him to shake Bennett

2    Genovesi down to get his jewelry back, and that account was

3    corroborated by the defendant's financial records, which show a

4    transfer to that person, or a person by the same name.

5        So your Honor, Bennett Genovesi's testimony, first of

6    all, he swore to tell the truth; second of all, it was

7    corroborated by the other evidence that's before your Honor;

8    and finally, it's just a patently incredible story, this claim

9    that the only thing standing between him and well over a

10   hundred million dollars' worth of Bitcoin is six words that he

11   gave to Bennett Genovesi.  It's just incredible.

12       And so, your Honor, if the Court holds him in contempt

13   and orders, like the Court did in *Chusid*, and keeps him there

14   until he either pays or he convinces this Court that he has

15   taken all reasonable steps available to him to satisfy his

16   obligation, then he will have that, he will have that

17   opportunity.  He can come forward and show where and how and

18   explain.  As of right now, the record before the Court simply

19   establishes that he's lied, he's fabricated, he hasn't paid,

20   and he is incredible.

21       THE COURT:  Thank you.

22       Mr. Gombiner.

23       MR. GOMBINER:  First, I think there are so many red

24   herrings here that it's practically like a school of fish.  But

25   let me just try to—

O2T1TRUA

1          THE COURT:  A school of red herrings.

2          MR. GOMBINER:  Yes, yes.  Let me just try to focus on

3     what's really transpired here.

4          Okay.  When Mr. Truglia was sentenced, he told the

5     Court that he could make full restitution.  Everyone understood

6     that the restitution that he was going to make was going to

7     come from a Bitcoin wallet that he had.  The government

8     understood that, the probation officer understood it,

9     Mr. Truglia's lawyer understood it, and Mr. Truglia understood

10    it.  Mr. Truglia's lawyer also informed the Court at the time

11    of sentencing that he couldn't make restitution immediately

12    because it would take a matter of a few weeks and other people

13    would have to be involved in it, okay?

14          THE COURT:  He was out at the time, right?

15          MR. GOMBINER:  No, he was in at that time.  He was in

16    custody at that time.  But he was going to be getting out

17    shortly.  Okay.

18          THE COURT:  When I sentenced him, was he in jail?

19          MR. GOMBINER:  Yes.

20          THE COURT:  He was in detention.

21          MR. GOMBINER:  He was in detention.  And that's what

22    Mr. Truglia——

23          THE COURT:  So he didn't tell me that he had to be

24    released from detention to get the key.

25          MR. GOMBINER:  Well, you know, I'm not sure that's not

1    really precisely true, because what Mr. Truglia's counsel

2    said—let me just find the quote here.  Mr. Truglia's counsel

3    said, well, he needs a little additional time, he said, because

4    since Mr. Truglia was incarcerated, it would take somewhat

5    longer to access the Bitcoin account, and he said, "This is

6    sensitive stuff.  He can't do it himself.  He can't do it

7    himself.  It's a process."  That's the November 30, 2022,

8    sentencing transcript at page 33.

9            Okay.  The record shows that as soon as Mr. Truglia

10   got out of jail, he did start making efforts to retrieve the

11   password to the Bitcoin account.  And he initially believed

12   that the device that he had provided to Mr. Genovesi, he

13   believed it was in Miami, because that's where Mr. Genovesi was

14   supposed to send all the stuff to his father.  So he asked his

15   probation officer for permission to search the storage locker,

16   and he searched it for several hours but could not find the

17   device.  And then later, he asked his probation officer for

18   permission to go to New York because he had given parts of the

19   password to three individuals, one of whom was Bennett

20   Genovesi, but two other people in New York.

21           He went to New York, he met with the defense lawyers,

22   he got two of the parts to the password, and then he took very

23   strenuous steps to get the third password from Mr. Genovesi,

24   including, according to Mr. Genovesi—who, I mean, I think

25   remarkably, the government continues to contend is a credible

O2T1TRUA

1    witness because Mr. Genovesi on his face is a liar and a thief.

2    I mean, he basically admitted it in court.  But putting that

3    aside, according to Mr. Genovesi, he was held at knifepoint as

4    Mr. Truglia was trying to obtain the password.

5         Okay.  He hasn't been able to do it, but that doesn't

6    suggest to me a lack of trying.  It suggests exactly the

7    opposite.  And there's absolutely nothing to suggest that

8    Mr. Truglia now has any alternative that he himself could do

9    anything else.

10        Now there is one thing that could be done here, which

11   the government surprisingly does not seem to have, even though

12   we've informed them of this months and months and months ago,

13   it was on the record back in August, that he has the password,

14   it's in a Proton email, which is held by a company called—or

15   server called Proton, which is based in Switzerland, and, you

16   know, the government—Mr. Truglia can't access that because

17   Proton has locked that account, but the government could try to

18   do that.

19        But I do want to—I think one thing that has

20   completely confused the situation is, the government seems to

21   suggest that Mr. Truglia is in violation of the restitution

22   order because he hasn't made any payments towards it and he had

23   some other money which he could have made some payment towards

24   the restitution order.  But that isn't the restitution order.

25   The restitution order is, make one $12 million payment on

1    December 31st and make one $8 million payment on January 31st.

2    It doesn't provide for, pay whatever you can or pay a part of

3    your monthly earnings or anything like that.  It's very

4    specific.  So when Mr. Truglia met with his probation officer

5    back in March, his financial disclosure form showed he had some

6    other assets.  His probation officer didn't say, hey, you need

7    to pay that towards restitution, and instead he gave him

8    permission to go to New York to try to get the Bitcoin account.

9    And the reason is because the order of restitution does not

10   provide for partial payments.

11           THE COURT:  That's nonsense, Mr. Gombiner.

12           MR. GOMBINER:  It's not nonsense.

13           THE COURT:  If you owe a hundred dollars and you have

14   50, you pay 50.

15           MR. GOMBINER:  Well, Judge, the Court could certainly

16   amend——

17           THE COURT:  He could go and talk to his probation

18   officer and say, look, I can't get my hands on all of this

19   money, but I can give you this, I can give $200,000 rather than

20   indulge myself with luxury hoodies and watches and sneakers.

21           MR. GOMBINER:  Judge, it is certainly possible, and it

22   should be done, I guess.  The Court could certainly amend the

23   restitution order.

24           THE COURT:  Did he ask for it?  Did he ever come up to

25   anybody and say, look, I can't get it?  He just didn't pay it.

O2T1TRUA

1          MR. GOMBINER:  Judge, what happened was, in April, he

2     went to New York to try to get——

3          THE COURT:  With Mr. McCarthy.

4          MR. GOMBINER:  And in May he's been incarcerated, and

5     he's been incarcerated ever since.  That record does not

6     reflect a willful failure to try to pay restitution; it

7     reflects exactly the opposite.  The restitution order is to

8     make two lump-sum payments.  It is not to pay whatever you've

9     got.  I mean, maybe the order should have been written

10    differently.  But it wasn't.  That isn't the order.  And you

11    can't violate——you can't claim that someone is violating an

12    order that doesn't exist.  I mean, you know, that's just the

13    way it is.  That's how the order was written.  In fact, some

14    of——the thing about, if you get other assets, you have to

15    disclose those to probation, that was specifically crossed out

16    of the order.  So there's no basis to say that.  Everything in

17    this case was predicated on the idea that there was a Bitcoin

18    account with more than $20 million in it.  At this point the

19    account, the Bitcoins are worth about $180 million, and the

20    idea that Mr. Truglia is, like, somehow preferring to sit at

21    the MDC rather than accessing the account where he could pay

22    the $20 million in restitution and to date probably has about

23    $160 million left over, that is a fantasy.  And, like, I

24    understand that people are upset that this didn't work out the

25    way, you know, everybody anticipated it would work out, but

1    that doesn't prove that Mr. Truglia has done something that

2    merits him sitting at the MDC.  He did make efforts, lots of

3    efforts, to get the password to his account.  They haven't

4    succeeded.  And the government still has not suggested what

5    else he is supposed to do now, or could do now that would give

6    him access to that account.  And obviously if there was

7    something he could do, he would do it, because then he would be

8    out of jail and extremely——he would be wealthier than all the

9    other people in this courtroom combined——well, except maybe

10   your Honor.  But putting that aside, you know, that is not a

11   basis for holding him in contempt or resentencing him or

12   anything else.  There's just nothing in this record that

13   establishes that Mr. Truglia has violated the terms of the

14   restitution order.  The fact that he had some relatively,

15   compared to $20 million, trivial assets that he didn't apply

16   towards restitution is not a violation of the order because the

17   order doesn't say you have to do that.  The order says you have

18   to make two lump-sum payments.  And as I said, everyone at

19   sentencing understood those lump-sum payments were coming from

20   a Bitcoin wallet that Mr. Truglia had, and his lawyer told the

21   Court it's a sensitive thing, it's a process, he needs to

22   have——other people need to be involved, and everyone accepted

23   that at the time.  And the fact that he hasn't been

24   able——partly because Bennett Genovesi is a thief——to get the

25   password is not a basis to punish Mr. Truglia or to hold him in

O2T1TRUA

1    contempt for something that he——that there is absolutely

2    nothing he can do that will ever allow him to purge that

3    contempt.  So, you know, you can keep him in jail, but it's

4    just——that's not keeping him in jail for any purpose other than

5    to punish him because people are upset that, you know, he

6    didn't do what he was supposed to, what everyone hoped he was

7    going to be able to do.  Yeah, we're agreeing he didn't do it,

8    but it's not his fault that he didn't do it.  And there's

9    nothing in the record to suggest otherwise.

10            I mean, I'm not even clear what the government's

11   argument is.  They seem to be saying that he's making up this

12   Bitcoin account, but they don't suggest he's got any other way

13   of paying $20 million.  And at this point the government has or

14   has frozen all of Mr. Truglia's assets.  They've got his

15   jewelry.  His Wells Fargo account has been frozen.  Mr. Truglia

16   doesn't have any other money right now.  So he's told me he's

17   got maybe 2 or $3,000.  So, you know, there's nothing

18   that——there's nothing more you can get out of him right now.

19   But even if you could, that's not what the order is.  And, you

20   know, it's not a technicality.  Yeah, maybe in a common sense,

21   you know, general sense, yeah, if I owe you a hundred dollars,

22   I'd rather get 50.  If you have an order that says, pay a

23   hundred dollars, you're not violating it because you have $10

24   and you don't pay it.  That's not a violation.  And that's the

25   situation here.

O2T1TRUA

 1          So I don't understand what the——there's nothing that a

 2   contempt order can do other than make people maybe feel like,

 3   you know, we did something, but it's not actually going to do

 4   anything because Mr. Truglia doesn't have any ability to purge

 5   himself of the contempt.  And you cannot resentence him to

 6   punish him because you think you didn't like the way things

 7   were done at sentencing.  A resentencing is supposed to be to

 8   advance payment of restitution, and it's not going to do that

 9   either.  It's not.  Resentencing is not some——you don't have

10   some open-ended thing where you can just say, oh, well, we're

11   mad about the way things turned out so now we're going to give

12   him a higher sentence.  The statute doesn't authorize that.

13   The statute makes clear that all the remedies have to help

14   further paying restitution, and that won't help any more than

15   holding of contempt will help.

16          What I think should happen here is the Court should

17   amend, which the Court definitely has the power to do, and

18   modify the restitution order, can make clear that Mr. Truglia

19   has to use all of his available assets to pay restitution,

20   which could include anything from what the government has

21   already got in their possession, and then going forward, it

22   should require Mr. Truglia to pay some percentage of his

23   monthly income toward restitution, and if he ever does——I mean,

24   you know, obviously he would very much like to get that Bitcoin

25   account.  If he does get it, then he can pay the restitution.

1   But keeping him in jail is not going to do anything.  That's

2   not the purpose of civil contempt.  It's not just to say, you

3   know, we're mad so stay in jail.  There's supposed to be

4   something you can do that will get you out of contempt.  And

5   here, there isn't, and nobody has even suggested what there

6   would be.  I mean, I would like to hear from the government

7   what they think Mr. Truglia ought to do, because if he could do

8   it, he obviously would, because he would be a rich man and out

9   of jail, instead of sitting in one of the worst detention

10  facilities in the entire country for the last six months.

11  Thank you.

12          THE COURT:  Thank you, Mr. Gombiner.

13          So let's review.  From the sentencing transcript of

14  November 30, 2022, at the bottom of page 30, Mr. Capozzi sets

15  the restitution, $20,379,000.

16          I asked Mr. Udell, his lawyer:  "What do you propose

17  that Mr. Truglia pay and when?"

18          Mr. Udell, at page 31:  "Here's the thing, Judge.  I

19  don't know if in fact Mr. Terpin," who is the victim, "has the

20  Bitcoin that he got from Mr. Penske at the time—and by the

21  way, he gave a number.  He said 627 and, you know, decimal

22  point Bitcoin.  If he has that today, we propose that it be the

23  22.6 gross number minus what the value of that Bitcoin is worth

24  today.  That's what we propose."

25          "THE COURT:  I'm asking you for a flat dollar amount,

O2T1TRUA

1    legal tender——that's dollars, not Bitcoin——"

2                   "MR. UDELL:  Fine."

3                   "THE COURT:  ——your client proposes to pay the victim

4    and when."

5                   "MR. UDELL:  ... First of all, and Mr. Truglia has

6    made clear, you know, your Honor is going to decide the

7    restitution, he's going to accept whatever your Honor's

8    decision is both on the sentencing and, obviously, on

9    restitution.  But in fairness, again... our point is just that

10   the credit should be the 22.6 minus——if he still has the

11   Bitcoin, the 22.6 minus the 10.5.  I can give you the sort of

12   exact——

13                  "THE COURT:  Roughly $11 million?"

14                  "MR. UDELL:  ... Yes."

15                  "THE COURT:  That's what he offers to pay?"

16                  "MR. UDELL:  I'm saying that's what we're respectfully

17   requesting it should be, the value of the Bitcoin backed out of

18   the 22.6.  I believe it's actually... 12.1."

19                  "THE COURT:  12.1.  And when?  He has the money?"

20                  "MR. UDELL:  Yes.  Let me——if I can have a break to

21   talk to Mr. Truglia for a moment?"

22                  "THE COURT:  Yes."

23                  "MR. UDELL:  But I have what I believe the answer is

24   to that, but let me just confirm it with my client."

25                  "THE COURT:  Yes."

1           And there's a conference with his client.

2           "MR. UDELL:  Your Honor, we'd respectfully request 30

3    days, and the reason is——

4           "THE COURT:  Thirty days?"

5           "MR. UDELL:  Yes.  So you know, obviously, he's

6    incarcerated, and it's access to a computer.  This is sensitive

7    stuff.  He can't do it himself.  It's a process.  But yes, we

8    respectfully request 30 days from date of judgment."

9           And it emphasizes it will be in US dollars, wire

10   transfers to the victim.  And that's what it was.

11          Now Mr. Truglia was incarcerated at the time, right,

12   Mr. Gombiner?

13          MR. GOMBINER:  Yes, he was, Judge.

14          THE COURT:  And he was not going to be out in 30 days,

15   was he?

16          MR. GOMBINER:  Well, it turns out he was going to be

17   out in 30 days because he got released on like December 27th,

18   so he actually got out——

19          THE COURT:  The prison authorities released him.  When

20   I sentenced him, he wasn't expecting to be out in 30 days, was

21   he?

22          MR. GOMBINER:  Judge, you know, I wasn't there for

23   that part of it so I'm not sure what he was expecting.  It's

24   not——

25          THE COURT:  How many months did I give him?

O2T1TRUA

1          MR. GOMBINER:  I think you gave him 18 months.

2          THE COURT:  And how much was time served up to that

3  time?

4          Mr. Capozzi, do you know?

5          MR. CAPOZZI:  I believe it was about a year.

6          THE COURT:  He had six months to go.

7          MR. CAPOZZI:  That's what I think the parties

8  understood.

9          THE COURT:  The point I'm making is that he wasn't

10  going to be out in 30 days, but he obligated himself to pay

11  $12.1 million.  And let's look at the order of restitution.  It

12  was I who crossed out these different clauses because they were

13  not relevant with a flat promise to pay defined amounts of

14  money.

15          Paragraph 2.  "Defendant shall pay restitution in the

16  manner and according to the schedule that follows, pursuant to

17  the statute.  $12,100,000 is due and payable on or before

18  December 31, 2022, and $8,279,007 is due and payable on or

19  before January 30, 2023."  And I wrote, "Upon payment, full

20  restitution will have been made."

21          And that order was dated December 1, 2022.  It was

22  signed by Mr. Capozzi, it was signed by Mr. Truglia, it was

23  signed by Mr. Udell, and it was signed by me on December 1,

24  2022.  There was a flat obligation.  It was an exchange, a

25  promise of specific payment without condition, without saying

1    that he had to get keys or passwords or anything else; flat

2    obligation to pay the victim $20 million.  And if I remember,

3    he turned to the victim and he said, "I'll pay you in full."

4    Well, he didn't pay in full and he didn't pay him in part.  And

5    I hold that these failures to pay were willful.

6         Mr. Truglia said to the victim, "I'm going to give my

7    best efforts to try and right my wrongs to you in any way

8    that's possible moving forward."  Truglia's counsel, Mr. Udell,

9    suggested making a prompt restitution payment totaling

10    $20,379,000, and asserted that Truglia would make payment

11    within 30 days.  That's at pages 32 and 45 of the November 30

12    transcript.

13         I told Mr. Truglia, "I'm impressed by the willingness

14    that you have shown in paying back the victim."  That's the

15    December 1 transcript at 15.  It was evident from his

16    willingness that he had the readiness and the ability to make

17    the payment he promised to make.  And I told him that this

18    readiness motivated me to sentence him well below the guideline

19    range of 51 to 63 months in custody.  I sentenced Truglia to 18

20    months' incarceration and three years of supervised release,

21    for the supervised release to commence on January 6, 2023.

22         So as of today, Truglia has not paid one cent of his

23    restitution, clearly violating the promise he made at

24    sentencing without condition of any kind, the signed consent

25    order of restitution which establishes no condition of source

O2T1TRUA

1 or anything else, and his supervised release obligations.

2 Probation found that he had failed to make a good-faith effort

3 to pay the court-ordered restitution.  And the proof amply

4 supports that finding.  Over the past 11 months, instead of

5 paying anything to Mr. Terpin, the victim, Truglia has been

6 able to fund a lifestyle well beyond his evident means and

7 never explained to the probation officer or to the Court how he

8 could do it.  Indeed, he hid his assets.  Truglia's Wells Fargo

9 bank account, which Truglia omitted from his financial

10 disclosure form, represents the nut of the problem.  A

11 statement in that account reflects monies coming in and out

12 from cryptocurrency platforms.  All of a sudden it seems

13 Mr. Truglia found his key.  It also reflects purchases for

14 luxury and nonessential goods, months after he defaulted on his

15 restitution obligation.  He bought luxury sneakers, Yeezys,

16 Louis Vuitton luggage, designer hoodies, Supreme apparel, sold

17 free watches for $92,000.  Of course these assets don't amount

18 to $20 million, but Mr. Truglia's failure to give account to

19 what he had and favoring his own indulgences over his

20 obligation to pay is indicative of his intent never to pay his

21 debt, his willfulness.  This is not a case of indigence.  This

22 is not a case of inability to pay.  Defense counsel wrote to me

23 November 16, 2023, to the effect, "Mr. Truglia has consistently

24 acknowledged that he has sufficient means with which to make

25 restitution."  Truglia has sought to portray himself as a man

O2T1TRUA

1    of wealth.  He texted Bennett Genovesi that he has eight

2    figures—that means millions—to live on.  And he takes photos

3    with Trezors, which are gadgets to activate cryptocurrency

4    accounts.  We've heard the witnesses that supported all these

5    findings.  We heard Christopher, or Chris Davis, the probation

6    officer who was supervising Truglia since January 2023.  He

7    testified that Truglia was aware of his restitution obligations

8    throughout his period of supervised release.  Davis testified

9    that on January 18, Truglia told him he spent three hours

10   looking for the keys to his crypto wallet in an undisclosed

11   storage unit, without success.  No mention of Mr. Genovesi, or

12   of the other two fellows.  At the end of March 22, 2023,

13   Truglia asked Officer Davis if he could travel to New York City

14   so he could get the keys to his crypto wallets.  Davis denied

15   the request.  Truglia had failed to provide documentation

16   regarding his employment and his financial information.

17   Truglia, indifferent to his obligations to his probation

18   officer, nevertheless went to New York City and told Davis he

19   could not find his wallet keys.  Matt Suhocki testified as a

20   senior financial investigator for the probation office.  The

21   government introduced his spreadsheet, which summarized his

22   findings with specific bank account statements.  It was

23   Mr. Suhocki who showed the Wells Fargo bank account that was

24   not included on Truglia's financial disclosure form.  And other

25   undisclosed transactions which I've referred to before.  I take

the inference from Truglia's failure to fully disclose his

assets a willfulness, a failure to abide obligations he took

upon himself.   Mr. McCarthy testified that he was counsel to

Mr. Terpin and he went and met with Mr. Truglia on April 6,

2023.   Truglia took him on his mission to get the codes.   He

said he took him because he wanted corroborating evidence,

McCarthy did.   Truglia said he had memorized the password to

his wallet but he needed 24 seed words to get to the point

where he could input his password.   And he told McCarthy once

he could access the wallet, he would transfer the required

amount to McCarthy.   McCarthy testified they made two stops in

New York City.   Each time Truglia would leave McCarthy for 15

minutes and return with a slip of paper which he said had eight

words, which he claimed to be the seed words.   He told McCarthy

that Bennett Genovesi had the final eight words, that he had

tried to obtain them the night before, but was unsuccessful.

Bennett Genovesi testified that he and Truglia were

nightclub friends, partied together two to three times a week.

In December 2021, Genovesi testified, Truglia asked him to

bring him a suit to the Dominick Hotel, and Truglia, instead of

a suit, or maybe in addition to the suit, gave him two duffel

bags.   He asked Genovesi to mail the two duffel bags to his

dad, Vincent.   Genovesi opened the bag and found fancy

deodorant, toiletries, a laptop, watch roll, and jewelry.   He

helped himself to the jewelry.

O2T1TRUA

1          Now I find it incredible that someone having

2    $90 million of cryptocurrency would give a password to a

3    nightclub friend whom he barely knew.  I find it improbable

4    that he told Genovesi to send the duffel bags containing the

5    password to his father.  If there was a password, there's no

6    reason why Truglia could not have sent that material to the

7    father directly, to his own father directly, instead of

8    entrusting it to a nightclub friend.  Genovesi testified that

9    Truglia never mentioned that there was a hard drive or password

10   in the bag and that he never saw them in the bags.  He

11   testified that he mailed the bags with all the contents to

12   Truglia's dad except for the items of jewelry he helped himself

13   to.

14         Vincent Genovesi said the bags came to him, but there

15   was no key or password or whatever in it.

16         I find from these accounts that it is improbable that

17   Truglia gave a valuable password to Bennett Genovesi, I find it

18   improbable that Truglia left himself without the ability to

19   gain access to $90 million, and growing, of cryptocurrency, and

20   I find by a preponderance of the evidence that all of this was

21   a ruse to renege on his solemn obligation to the Court and to

22   the victim to pay restitution.

23         The question then comes:  What is the appropriate

24   remedy?

25         I have the power to resentence Mr. Truglia.  After

O2T1TRUA

1    all, he lied to me.  He lied when he said he would make full

2    restitution in order to gain a better sentence.  I would have

3    the power to resentence him.  But Mr. Truglia has shown that he

4    prefers jail to paying his debts.  And so an additional jail

5    term would mean nothing in terms of the real world of getting

6    the victim paid, and fulfilling the restitution obligations he

7    took on.  The only effective remedy is contempt.

8            And I look to the precedent that Judge Kaplan set in

9    the *Chusid* case.  Mr. Truglia will be sent to jail as long as

10   he does not honor his obligation to pay Mr. Terpin.  That's his

11   obligation.  He's in contempt of that obligation, and he can

12   purge himself instantly and avoid a jail term on the sentence

13   of contempt or he can sit in jail until he decides to pay

14   Mr. Terpin.  I will defer resentencing for six months and

15   examine at that time whether it would be appropriate or not to

16   resentence Mr. Truglia, to make up for the benefit that

17   Mr. Truglia got when he lied to me or to give an appropriate

18   sanction for violation of the conditions of supervised release.

19   That is the order of the Court.

20           Mr. Capozzi, have I missed anything?

21           MR. GOMBINER:  Judge, can I just consult——

22           THE COURT:  I'll ask you.

23           Yes.  Mr. Capozzi?

24           MR. CAPOZZI:  No.  I believe that adequately

25   establishes a basis for the contempt and to set a six-month

1    return for reconsideration of resentencing.

2              THE COURT:  It would be better if you spoke louder and

3    not on your way to standing up or sitting down.

4              Mr. Gombiner, do you want to say something?

5              MR. GOMBINER:  Judge, with respect to the contempt

6    sanction, is the Court's order that Mr. Truglia can purge

7    himself of contempt by paying whatever money he has or is the

8    Court's order that he can purge himself of contempt by paying——

9              THE COURT:  Paying what he promised to pay.  Because I

10   don't believe that he doesn't have access, for the reasons that

11   I explained——his dishonesty throughout, his finding of more

12   reasons not to pay, and the improbability of his stories.

13             MR. GOMBINER:  Well, I mean, I don't want to reargue

14   the whole thing, but——given the government's position that this

15   Bitcoin account, while it is——that Mr. Truglia does not in fact

16   own that Bitcoin wallet, there's no one else has

17   identified——and they can't because it doesn't exist——no one

18   else has identified any other way he could pay $20 million.  So

19   I'm not sure how he's ever——he's never going to be able to

20   purge himself of this order.

21             THE COURT:  Well, that wasn't his position when

22   he——sorry.  Are you finished?

23             MR. GOMBINER:  So all I'm saying, Judge, is, like, he

24   doesn't have any way to access the Bitcoin wallet other than

25   what he's done, and no one else has suggested what else he's

O2T1TRUA

1  supposed to do, and he doesn't have any other money, so he's

2  never going to be able to satisfy the contempt order.

3      THE COURT:  Well, that's what you say, but it's not

4  what I believe.

5      MR. GOMBINER:  Okay.  Well, Judge, he's already been

6  sitting there for six months.  He hasn't done it now.  What's

7  changed?

8      THE COURT:  Thank you, Mr. Gombiner.

9      Mr. Capozzi.

10      MR. CAPOZZI:  Your Honor, just the one question.  In

11  *Chusid*, Judge Kaplan did have the alternative of——

12      THE COURT:  I'm getting to that.

13      MR. CAPOZZI:  Okay.

14      THE COURT:  Mr. Truglia is ordered to be incarcerated

15  until such time as he satisfies his obligations to make

16  restitution or establishes to the satisfaction of the Court

17  that he has taken all reasonable, bona fide steps available to

18  him to satisfy his restitution obligations, to paraphrase from

19  *United States v. Chusid*, 372 F.3d 113 (2d Cir. 2004), affirming

20  Judge Kaplan, and that discussion is at page 116-117.

21      Okay, folks.  We will reconvene for an adjourned

22  resentencing, at September 17, at 11 a.m., or such sooner time

23  as I'm advised that Mr. Truglia has paid his restitution

24  obligations or on application by his counsel showing that he

25  has taken all reasonable, bona fide steps available to him to

1    satisfy his restitution obligations.

2            MR. FLOOD:  Could I be heard, Judge?

3            THE COURT:  You may, Mr. Flood.  Always.  I would

4    never cut you off.

5            MR. FLOOD:  I appreciate that, and I'll be brief.

6    Just for clarity of our understanding of——yes, sir.  I'll go to

7    the podium.

8            Thank you, sir.  Just for the purposes of our

9    understanding of the state of the record, the Court has found

10   Mr. Truglia in contempt on the record before the Court.  That's

11   a final order.  But with regard to the resentencing and

12   violations of supervised release, the case is adjourned,

13   continued to——I heard a proposed date.  I didn't know exactly

14   what it was.  I think it was in September.

15           THE COURT:  That's adjourned to September 17, at

16   11:00, or such sooner time, as I said before.

17           MR. FLOOD:  Assuming the theoretical possibility that

18   the contempt is purged by complete payment of——

19           THE COURT:  Or application by counsel in the way I

20   said.

21           MR. FLOOD:  I understand.  But with regards to the

22   contempt order, just so we understand the appellate record to

23   the extent that we could pursue appellate remedies, that the

24   order of holding him in contempt is final as of today.

25           THE COURT:  I don't understand what you're saying,

O2T1TRUA

1  Mr. Flood.

2          MR. FLOOD:  I can review the record, your Honor, but

3  the Court has utilized a number of different tools procedurally

4  before today.  I'm just trying to discern what is final and

5  what isn't.

6          THE COURT:  I ordered the contempt.

7          MR. FLOOD:  Yes.

8          THE COURT:  Final.

9          MR. FLOOD:  Understood.

10          THE COURT:  I put off the question of resentencing——

11          MR. FLOOD:  Yes.

12          THE COURT:  ——and/or violation of supervised release.

13          MR. FLOOD:  Understood.  So that's really all I wanted

14  to clarify, your Honor.

15          THE COURT:  Sorry?

16          MR. FLOOD:  Thank you.

17          MR. GOMBINER:  Thank you, Judge.

18          THE COURT:  Okay.  Anything further?

19          MR. CAPOZZI:  No, your Honor.

20          THE COURT:  Thank you, folks.

21          MR. GOMBINER:  Thank you, Judge.

22                              o0o

23

24

25