**Victim Impact Statement submitted by Michael Terpin through his attorneys Greenberg Glusker Fields Claman & Machtinger.**
*United States v. Truglia*, Case No. 19 Cr. 921 (S.D.N.Y.) (AKF) (*"Truglia* Matter")

My name is Michael Terpin. Although I am not referenced by name in the *Truglia* Matter, the allegations in the indictment relate solely to the January 7, 2018 theft of my cryptocurrency (including the "Triggers" mentioned in Nicholas Truglia's October 14, 2021 plea agreement and his statements at his plea hearing on October 28, 2021).

### Summary

I welcome the opportunity to provide the Court with an account of how the theft perpetrated by Mr. Truglia has profoundly affected me and my wife in the more than four years since it has occurred. I am willing to testify to the Court in person or over Zoom regarding these matters and I urge the Court to take my statement into account in Mr. Truglia's sentencing both as to the time that Mr. Truglia is required to serve in jail and in fixing the amount of the restitution that the Court may order be paid to me as the victim of this crime. I particularly wish to draw the Court's attention to the fact that Mr. Truglia perjured himself in his statements to the Court by trying to minimize his involvement in his hacking of my accounts and the amount of the cryptocurrency that he stole from me, as well as the fact that I am told he violated his parole by having mobile devices and SIMS in his home. Mr. Truglia's statements in recorded conversations (please see the substantial appendix below) clearly show that he received a much more substantial amount of money and was deeply involved in my hack. He was in point of fact a partner in the criminal gang who perpetrated it and I believe it is likely that he will harm other victims in the future through SIM swaps or hacks.

Through his actions, Mr. Truglia inflicted very substantial harm on me which caused not only severe emotional distress, but also forced me to spend hundreds of hours of time and millions of dollars to attempt to hold him to hold him and others (including AT&T, who acted through its bribed contractor) responsible for the harm that they caused me. Above all else, it is important for the Court to realize that the actions of Mr. Truglia and the other young members of the gang (which they saw as highly profitable entertainment with no regard to the damage done to careers and lives) had and continue to have deleterious effects on their victims, including me.

The theft by Mr. Truglia and his accomplices of roughly $24 million worth of my cryptocurrency on January 7, 2018 profoundly affected my wife and me financially. The cryptocurrency had a value of over 1,400 Bitcoin at the time of the theft. As I later discovered, these thieves (some of whom were teenagers), including Mr. Truglia, bragged openly to their friends and on social media about their role in the theft. Moreover, my trust in my mobile carrier—AT&T—which is required by law to protect the privacy of my communications and refused to compensate me for its violation of the law—was eroded to the point where I dropped them as a carrier and brought a lawsuit against them in the United States District Court for the Central District of California (*Terpin v. AT&T*, Case No. 2:18-cv-06975-ODW-KS).

Unable to obtain immediate redress, I was forced to shoulder the very considerable expense of conducting my own investigation and to bring two RICO lawsuits against the hackers (Nicholas

Truglia and Ellis Pinsky) to recover the stolen funds. I have to date spent over $3 million of my own funds in these efforts, including the AT&T lawsuit. Although I eventually received some stolen funds from Mr. Pinsky, I have recovered nothing from Mr. Truglia (even though I have a $75.8 million default judgment against him under RICO laws, where a California civil court agreed that he indeed was part of an ongoing criminal conspiracy), while my case against AT&T is still proceeding.

The effect of the January 7, 2018 hack on me has been not only financial. I spent countless hours investigating what happened, which led to loss of business clients and opportunities that I can now in retrospect easily value in the millions of dollars. My wife and I have also had our sense of personal security shattered, as we were informed of at least two death threats made against us from members of the gang (I informed the FBI about the first one and they investigated it; in the second case, the FBI informed me, as the death threat plotting against me was being made in the hacker chat rooms where, according to his own taped conversations we submitted to law enforcement, Truglia frequented and used to recruit new criminals into his enterprise).

As a result of publicity regarding my January 7, 2018 hack, I have been contacted by literally hundreds of other victims of SIM swaps who have lost millions of dollars' worth of cryptocurrency, as well as cash, social media account ownership, personal photographs and other private, often extremely valuable, data. I have spent significant amounts of time (without compensation) advising these other victims, have directed them to law enforcement authorities for assistance, and (in the absence of effective action by the mobile carriers' regulator, the FCC) have provided other insights into both the hackers and the systemic weaknesses of mobile carriers. The theft by Mr. Truglia and others of my cryptocurrency have also prompted me to devote additional time and resources to publicizing the weaknesses of the protections afforded subscribers' mobile communications. My efforts, as well as my case against AT&T, have been referenced and cited in the pending regulation by the current Biden administration FCC.

In addition to the expenditures of time and money, the January 7, 2018 hack perpetrated by Mr. Truglia and others devasted my wife and me. I lost countless nights of sleep, lost important clients and damaged relationships through missed meetings and had near-constant stress for the first year or more following the hack due to the hundreds of hours required to deal with authorities, exchanges, informants and lawyers. Not only did we lose a substantial amount of money, but our private communications (which are protected against disclosure by the Federal Communications Act and privacy laws) were intercepted by a gang of thieves (including Mr. Truglia) and were used by them to rob us of cryptocurrency. Adding insult to injury, Mr. Truglia and others bragged of their exploits on social media, referred to me in derogatory terms, used the stolen money to hire private jets, buy expensive watches and champagne, and otherwise exhibited a callous disregard for the harm that they inflected on their victims, including my wife and me. The fact that the hackers (including Mr. Truglia) came from privileged backgrounds compounds the harm and injury.

I have pursued these matters, including three lawsuits, because I wanted to send a strong message that these crimes are not victimless and that the hackers' activities have profound impacts on the lives of person's whose privacy have been invaded and whose earnings and

savings have been stolen. I have also pursued my considerable efforts to combat the scourge of hacks perpetrated by Mr. Truglia and others of his ilk to stop what has become a serious threat to the continued growth of the cryptocurrency industry (now more broadly known as "blockchain" or "Web3"). I hope that my unfortunate experience can provide a catalyst for change to provide an even more solid foundation for one of the leading new industries of this century.

Because Mr. Truglia perjured himself in seeking to minimize his involvement in my hack, I believe that the Court should reject Mr. Truglia's plea bargain and impose the maximum possible sentence on Mr. Truglia, as well as award me the full amount of restitution noted below in the form of $21,670,719,84, representing my net loss deducting a partial recovery from Mr Pinsky, or the net amount of 855.811 Bitcoin, whichever is greater.

### Background

I have been a prominent marketing and business consultant to technology companies since 1990, and have followed the waves of multimedia, online services (advising America Online in its early days, among many others), Internet (Match.com, Motley Fool), videogames (Konami), consumer electronics (first digital camera), social media and finally, starting in 2013, focusing on blockchain clients. I also invested in these companies, and when cryptocurrency companies began to issue tokens, I would often take my payment in those early tokens and/or in Bitcoin. I worked advising Ethereum and Tether for their launches, plus more than 300 other blockchain and Web3 entities since 2013. The cryptocurrency that was stolen from me represented payment for my services and it appreciated greatly as the market grew. I am considered one of the pioneers in this field (CNBC called me the "crypto godfather") and I was well-known in the field prior to the January 8, 2018 hack.

Cryptocurrency (such as Bitcoin and Ethereum) is digital or virtual currency designed as a medium of exchange in which encryption techniques generate units of currency that verify the transfer of funds through an encrypted and decentralized ledger called "blockchain." Cryptocurrency is decentralized, operates independently of a central bank or other regulatory authority and is often traded by parties through "exchanges." Once a transfer of cryptocurrency has occurred, it is often extremely difficult if not impossible to trace the transfer to the individual receiving the currency. And it is impossible to reverse the transaction without possession of certain private and complex key numbers held only by the transferor. Cryptocurrency thus makes an attractive target for hackers and criminals such as Nicholas Truglia and the other hackers who engaged in the theft of my cryptocurrency in January 2018 through a "SIM swap."

A SIM swap is an illegal maneuver by which a hacker takes over a victim's cellular phone account. Once this occurs, a hacker has control of the victim's phone account and can proceed to intercept messages to reset passwords and to access the victim's accounts to transfer funds (such as cryptocurrency) to hackers or their accomplices. A SIM swap makes use of a "SIM" or "Subscriber Identity Module" in a mobile phone that enables the device to communicate with a mobile provider (in my case, AT&T). In an unauthorized SIM swap, a hacker (like Truglia and his accomplices), intercepts communications, such as text messages, to gain access to accounts (such e-mail and other accounts) to discover information that may be used to perpetrate a theft of cryptocurrency. The process often begins when a hacker bribes an employee of a carrier to

transfer the victim's phone number to a phone under the control of the hacker and the hacker's accomplices (as happened to me at the hands of Mr. Truglia and Mr. Pinsky). Once the unauthorized SIM swap has occurred, the hacker uses access to the victim's phone to impersonate the victim with service providers, to request changes to account settings and to reset passwords to take control of the victim's accounts.

In addition to using the access to the phone account to reset account passwords, hackers also frequently intercept "2-Factor Authentication" of 2FA messages sent to the victim's telephone so that the hackers can gain access to the accounts owned by the victim. The hackers typically target victims, such as me, who are known to be involved with cryptocurrency, in order to gain access to the "private key" of a cryptocurrency account. The "private key" is used to write in the public ledger to transfer cryptocurrency. Typically owners of cryptocurrency, like myself, keep these complex keys secure because once a transfer of cryptocurrency occurs it cannot be reversed or readily traced and can be dispersed anywhere in the world.

### The January 7, 2018 SIM Swap.

On January 7, 2018, I discovered that I was the victim of an unauthorized SIM swap. When my phone went dead, I realized to my very considerable alarm that a hacker or hackers (whose identity was then unknown to me) had gained access to my mobile telephone account and could initiate and intercept 2FA communications to attempt to gain access to my cryptocurrency accounts. When I lost access to my accounts, I began a desperate attempt to investigate what accounts (including not only cryptocurrency but other online accounts) that the hackers were accessing. At the same time, my wife attempted to contact AT&T to reverse the SIM swap so that the hackers would no longer have access to my mobile account. In the ensuing two days, I found to my distress that the hackers had gained access to cryptocurrency (including Triggers, Steem and Skycoin) that were worth over 1,400 Bitcoin, or roughly $24 million at the time. The January 7, 2018 hack was thus the beginning of what is now an over four-year effort on my part to investigate the circumstances of my hack, including the identity of the hackers and what they had done with my money, and of my efforts to hold the hackers and AT&T responsible for perpetuating and facilitating the unauthorized SIM swap that led to the robbery of my cryptocurrency.

### My Investigations Regarding the January 7, 2018 Hack

Almost everything that I have learned about the January 7, 2018 hack over the last years has been due to my own efforts, assisted by attorneys and certain third parties. Although I have had extensive dealings with law enforcement, I have learned very little from such authorities about the hack. Indeed, I have provided much more information to law enforcement, including numerous FBI agents, than I have every received from them. Through my own investigations, including informants, I have uncovered the information about the involvement of Nicholas Truglia, Ellis Pinsky and others in the January 7, 2018 hack which I outline below.

The information that I am supplying results from my expending an untold number of hours doing my own investigations, talking to informants, obtaining evidence from such informants (such as recordings of Mr. Truglia bragging about his hacking exploits) and communicating the

information that I have gathered to law enforcement. My contacts with federal law enforcement alone have entailed a very considerable number of hours of work on my part, including communicating with at least five separate FBI agents and the US Secret Service. My attorneys have also had contact with the U.S. attorney's office. In addition, I have also had contact with other law enforcement officers, including those of the REACT task force in Santa Clara County, California and the Santa Clara County district attorney who prosecuted Nicholas Truglia for another SIM swap hack and assisted with other cases against Mr. Truglia in California. I have turned over the information that I have painstakingly gathered at great personal expense and effort to these law enforcement authorities and to other victims because I believed it would assist them not only in my case, but in the myriad of SIM swap cases that have arisen in recent years.

I provide this information to the Court because it shows that Mr. Truglia made false and perjurious statements to the Court in conjunction with his plea in an attempt to minimize his sentence and restitution. At his plea hearing before the Magistrate Judge, Mr. Truglia said that his involvement in the hack of my account was a "terrible mistake" because he let an "acquaintance" use his Binance account. Mr. Truglia also stated that it was his "acquaintance" who accessed Mr. Truglia's Binance account so that he could convert a cryptocurrency called "Triggers" in his account to Bitcoin and transfer the Bitcoin into Mr. Truglia's Binance account, leaving a small amount as a fee for Mr. Truglia. Mr. Truglia also said that he "revoked" his acquaintance's access to his account and kept the remaining amount for himself. Leaving aside the inherent implausibility of this account (why would one allow a mere acquaintance access to a cryptocurrency account?), Mr. Truglia's recounting of a passive, regretful role is flatly contradicted by Mr. Truglia's own words in recordings that I obtained. Moreover, it has come to my attention that Mr. Truglia violated the terms of his parole by having SIM and mobile phones in his home, which indicate that he may well have been continuing to perpetrate fraud on victims and that his statements to the Magistrate Judge that this was a one-time "mistake" are false.

*Terpin v. Truglia* **(Case No. 18 ST CV09875, Los Angeles Superior Court)**.

In the autumn of 2018 an informant named Chris David provided me with extensive information regarding my January 7, 2018 SIM swap, including recordings of Mr. Truglia in which Mr. Truglia described his SIM swap exploits (including my SIM swap). I provided these tapes to law enforcement and also, at considerable personal expense, had my lawyers prepare, file and serve a civil complaint against Mr. Truglia on December 28, 2018 containing counts for (1) conversion; (2) money had and received; (3) violation of Cal. Penal Code §502 (unauthorized access to computers); and (4) violation of the federal Racketeering Influenced and Corrupt Organization Act (RICO); and (5) imposition of a constructive trust. At the time that *Terpin v. Truglia* was filed, Mr. Truglia was confined in Santa Clara County jail pursuant to a 21-count felony complaint brought by California authorities dated November 13, 2018 relating to other victims of SIM Swaps (but not my SIM swap).

My complaint against Mr. Truglia outlined the facts that I had uncovered regarding Mr. Truglia's actions, including the fact that Mr. Truglia had registered new cryptocurrency accounts, including at Binance, after my SIM swap, and that Mr. Truglia had engaged in money laundering after my hack to avoid detection. The Complaint also alleged other facts specific to my SIM

swap, including Mr. Truglia's having told someone named Ryan O'Keefe that he had stolen a cryptocurrency wallet with over 20 million in it, that he had texted another person named "Sina" that "I'm a millionaire. I'm not kidding. I have 100 Bitcoin," and that he also texted that "today my life changed forever" and that he would hire "porn star escorts" and take his friends to the Super Bowl. (Complaint ¶ 15).

After filing the Complaint against Mr. Truglia, my lawyers and I conducted further investigations regarding Mr. Truglia's involvement in my SIM swap, including interviewing and preparing a declaration on behalf of Chris David to obtain a writ of attachment against Mr. Truglia. Because we were concerned that Mr. Truglia might be released on bail and that there was a possibility that his assets would be depleted (including the proceeds of his theft of my money), my lawyers and I were forced to work extensively in the week between Christmas and New Year's to prepare papers to request emergency actions by the Court that sought to prevent Mr. Truglia's assets from being dissipated. This entailed considerable personal sacrifices by all concerned during the holiday season.

On December 31, 2018, we filed our papers for a writ of attachment against Mr. Truglia's assets, citing the irreparable injury that might occur were the relief not granted, including the easily dissipated and untraceable nature of cryptocurrency, Mr. Truglia's profligate spending habits, and the dangers that would occur if Mr. Truglia were released from jail and gained access to the stolen cryptocurrency. In the course of preparing these papers, we learned additional facts regarding the January 7, 2018 hack, including Mr. Truglia's possession of Trezors (which are used to hold cryptocurrency assets), Mr. Truglia's confession to Chris David that he and a confederate named Ellis Pinsky had hacked me to steal $24 million worth of cryptocurrency, and Mr. Truglia's confession that I was his biggest SIM swap. *See* Chris David Declaration ¶¶ 11-12, 16. We also provided the Court with details of Mr. Truglia's assets, more details regarding his extravagant spending habits, including living in a luxury apartment in New York, wearing a Rolex watch and plans to purchase a private jet and a Manhattan condo. *Id.* ¶¶ 4-5. Further details regarding the details of the recorded conversations with Mr. Truglia are found in Exhibit A.

In mid-August 2018 (before he went to jail) Mr. Truglia again admitted his guilt for stealing my cryptocurrency. On his public Twitter account (@erupts) at Twitter.com, Mr. Truglia admitted six times that he "stole 24 million."

On January 4, 2019, the Los Angeles County District Court issued an order granting my request for writs of attachments for accounts at numerous financial institutions where Mr. Truglia was believed to have assets. Over the following weeks, we attempted to locate funds in these institutions. Unfortunately, Mr. Truglia had apparently been able to remove funds from these institutions and we were unable to locate any funds to attach. We were, however, able to obtain records from the Gemini cryptocurrency exchange. These records, which I have reviewed, indicated a link between the funds Mr. Truglia had in that exchange and Binance. Notably, Mr. Truglia doesn't mention the Gemini account in his plea in this case.

Mr. Truglia never responded to either the complaint or the writs of attachments in my action. We therefore proceeded to obtain a default judgment against Mr. Truglia in the action on April

6

30, 2019. The total judgment of $75,832,076.03 consisted of compensatory damages, trebling of compensatory damages for the RICO violation, costs and prejudgment interest. To date, Mr. Truglia has not satisfied *any* part of the judgment. In addition to this judgment, I estimated that I spent hundreds of thousands of dollars in attorney fees in filing the complaint, application for writ of attachment, and default judgment against Mr. Truglia (and much more pursuing other hackers, including Mr. Pinsky. Despite all of these very considerable efforts, I have never received any recompense from Mr. Truglia for the losses that I suffered because of the January 8, 2018 SIM swap.

*Terpin v. Pinsky*, (Case No. 20-CV-3557 (CS) (LMS) (S.D.N.Y.)) ("*Pinsky* Matter")

My efforts to pursue Mr. Truglia for the harm that he inflicted led me to discover and pursue my claims against another member of the Mr. Truglia criminal enterprise—Ellis Pinsky--which was filed in the Southern District of New York on May 7, 2020. The facts that I have learned regarding Mr. Pinsky support the view that Mr. Truglia has made false statements to the Court regarding his involvement in my hack.

Mr. Pinsky, at the time of my SIM swap was a 15-year-old teenager who resided with his mother in suburban New York. As I understand it, he turned 18 in early 2021. Mr. Pinsky was mentioned by Mr. Truglia in the recorded conversations that were provided to me by Chris David and that I turned over to law enforcement.

As alleged in my complaint in the *Pinsky* Matter, after the theft of my cryptocurrency, the criminal gang (which included Mr. Truglia) transferred the currency to five accounts under their control at the cryptocurrency exchange Binance. These transfers included the conversion of the Triggers (which formed the bulk of the stolen cryptocurrency) to Bitcoin (BTC). Although Binance has refused to provide information to me about its investigations of the matters, I believe—through my investigatory efforts—that Mr. Truglia had considerable involvement in the criminal enterprise and actively participated in the transfers to Binance through multiple transactions from January 7-9, 2018. After these transactions, the enterprise divided up the proceeds of my hack with Mr. Pinsky, another unidentified persona and Mr. Truglia receiving greater amounts and other members of the enterprise receiving smaller amounts. The members of the enterprise then converted the BTC to cash, which they used to purchase luxury goods, services and entertainment. Mr. Truglia's claim that he received a relatively small amount from my hack is therefore false.

**Requests Regarding Sentencing, Forfeiture and Restitution.**

Along with my lawsuit against AT&T, my lawsuits against Mr. Truglia and Mr. Pinsky seek to make me whole for my losses (as well as to obtain additional damages as allowed by laws such as RICO). In my view, it is important that brazen criminals (whatever their youth) be held responsible for the serious detrimental effects of their crimes, including through significant jail time, forfeiture and restitution to compensate the victims. Although hackers like Mr. Truglia may think this is only a game, their acts have real effects on people like me and my wife.

In the case of Nicholas Truglia, I urge the Court to take into consideration in sentencing and imposing restitution the impact that his theft has had on me and my wife. As to restitution, I urge the Court to return to me not only the forfeiture amount of $973,010.72 (which I understand is specifically traced to my hack), but the entire 100 BTC which Mr. Truglia admitted to stealing. Alternatively, I request my entire remaining loss of $21,670,719.84 as calculated in the chart on Exhibit B.

However, the restitution statute alternatively provides for the return of the property taken (here cryptocurrency) and expressly permits that the restitution amount be calculated as the value of the property at the time of the sentencing if the property itself cannot be returned. At the time of the theft, the stolen cryptocurrency was worth over 1,400 Bitcoin. Giving credit for the partial amount that has been recovered, I request that the restitution amount be set at the unrecovered amount of 855.811 Bitcoin, or at the USD equivalent thereof at the time of sentencing if such sum is greater than my entire remaining loss of $21,670,719.84. *See* Exhibit C.

Importantly, had the cryptocurrency not been stolen in 2018, I would have converted it to Bitcoin in the days that followed, as I was in the process of doing with other smaller cryptocurrencies I owned. While there are literally thousands of different coins and tokens in the cryptocurrency space, Bitcoin is the most well-known and the cryptocurrency that is most typically used to store value. Mr. Truglia should certainly not be heard to claim that I would have not taken such steps when he (together with Mr. Pinsky and others) did precisely this, converting the stolen assets to Bitcoin. Indeed, under the law as I understand it, the converted Bitcoin that was held by Mr. Truglia and the others involved as mine under a theory of constructive trust.

Rather than the return of the US dollar equivalent at the time of the theft (which would potentially serve to unjustly enrich Mr. Truglia), I want to have returned the Bitcoin-equivalent of what they took from me, as that is what I would be holding today had Mr. Truglia and those working with him committed this crime, if such sum is greater than my entire $21,670,719.84 loss at the time of the theft. To the extent that is not possible, practicable, or adequate, the restitution amount should be based on its value at the time of the sentencing, which I am informed is permitted under 18 USC § 3663A(b) ("(The order of restitution shall require that such defendant—(1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense—(A) return the property to the owner of the property or someone designated by the owner; or (B) if return of the property under subparagraph (A) is impossible, impracticable, or inadequate, pay an amount equal to—(i) the greater of—(I) the value of the property on the date of the damage, loss, or destruction; or (II) the value of the property on the date of sentencing, less (ii) the value (as of the date the property is returned) of any part of the property that is returned.").) (Emphasis added.)

Calculating the restitution in this manner would also properly recognize that cryptocurrency is a volatile asset and that Bitcoin, which I would have held, may appreciate in value. An order of restitution calculated in this manner would award the upside of the market to me, and not to Mr. Truglia, if the value is more at the time of sentencing than at the time of the theft. Had Mr. Truglia stolen gold bullion from me that had then tripled in price, he should not be permitted to satisfy his restitution obligation by selling off one-third of what he stole (and be allowed to keep

the other two-thirds). Similarly, the statue allows award of the property on the date of the theft if such sum is greater than that at the time of sentencing.

Respectfully submitted,

/s/ Michael Terpin

Michael Terpin

cc: Timothy Capozzi, Assistant United States Attorney
cc: Johnny V. Kim, United States Probation Officer

**Exhibit A: Details from Mr. Truglia's Recorded Conversation.**

In a September 2018 conversation Truglia admitted:

- How Pinsky and he [Truglia] hacked me to steal $24 million worth of cryptocurrency;
- How he and Pinsky laundered cryptocurrency holdings out of the blockchain into cash;
- How he had an account at the Gemini exchange and took out $1,200,000;
- How he committed tax fraud;
- How he saw records indicating that in December 2017 (before my hack), Mr. Pinsky had $70 million; and
- How I was too "dumb" to be able to figure out what happened and trace the laundered cryptocurrency holdings.

In another one of the recorded conversations, Mr. Truglia related the following to a friend:

- [Mr. Truglia] will never be caught hacking/stealing because he is so good at it—literally, "how are they going to prove . . . my story wrong?"
- "Nobody can get me in trouble. Nobody can put me in jail. I would bet my life on it, actually"; and
- As of September 2018, Mr. Truglia had $60 million of Bitcoin.

In another 2018 recorded conversation that I uncovered in December 2018 (and which were provided to the Court in seeking the writ of attachment), Mr. Truglia admitted:

- He told police he had $60 million in cryptocurrency when they came to his apartment;
- He had stolen all his money and had not legitimately accumulated his wealth;
- He was a computer hacker and admitted on tape that he stole his victims' cryptocurrency holdings and that this was thrilling for him (he called it "the thrill of the game") and said he would never stop doing this even if there was no money involved because it was a "mind game"
- His partner Ellis Pinsky had stolen between $70 and $80 million through hacking of multiple victims and was a professional thief.
- Mr. Truglia claimed on tape to be a "Robin Hood" who robs from the rich but does not give to the poor;
- Mr. Pinsky and Mr. Truglia did SIM swapping with Mr. Pinsky intercepting 2FA messages to get into the account and with Mr. Truglia directing him specifically to look inside of a Microsoft program, OneDrive, which was pivotal in the success of the theft. It took all three actors, including Jahmil Smith, an AT&T contractor who took a bribe, to release the SIM card to the Pinsky gang, which included Truglia;
- My SIM swap was the biggest one conducted by Mr. Truglia. He references me, Michael Terpin, by name in a taped conversation where he brags about the theft.

Exhibit B

## LOSS CALCULATED IN USDOLLARS ("USD") BASED ON USD VALUE AT TIME OF CONVERSION/RECOVERY

| Currency | # Coins | Price at Conversion | Conversion Date | USD Value (at time of Conversion |
|---|---|---|---|---|
| Triggers | 3,000,000 | $7.577 | 1/7/18 | $22,731,000.00 |
| Sky | 20,000 | $48.41 | 1/7/18 | 968,200.00 |
| Steem | 12,500 | $6.48 | 1/7/18 | 81,000.00 |
| **AMOUNT CONVERTED** | | | | **$23,780,200.00** |
| Amounts Recovered | | | 12/12/18 & 2/8/19 | ($2,109,480.16) |
| **UNRECOVERED LOSS (USD)** | | | | **$21,670,719.84** |

As shown, the base amount requested for restitution is $21,670,719.84 (calculated using the USD value at the time of conversion and recovery and giving credit for the approximately $2 million paid voluntarily by Mr. Pinsky on or about February 8, 2019 and a small amount recovered in December 2018). I have provided this calculation as I recognize that the courts typically operate in, and convert to, US dollars.

EXHIBIT C

## LOSS CALCULATED IN BITCOIN ("BTC") BASED ON BTC VALUE AT TIME OF CONVERSION/RECOVERY

| Currency | # Coins | Conversion Date | USD Value | USD/BTC Value | LOSS IN BTC |
|---|---|---|---|---|---|
| Triggers | 3,000,000 | 1/7/18 | $22,731,000.00 | $16,033.00 | 1,417.763 |
| Sky | 20,000 | 1/7/18 | 968,200.00 | $16,033.00 | 60.388 |
| Steem | 12,500 | 1/7/18 | 81,000.00 | $16,033.00 | 5.052 |
| **TOTAL** | | | **$23,780,200.00** | | **1,483.203** |
| Amounts Recovered | | 12/12/18 | ($44,923.86) | $3,861.43 | (11.634) |
| Amounts Recovered | | 2/8/19 | ($2,064,556.30) | $3,352.87 | (615.758) |
| **UNRECOVERED LOSS (BTC)** | | | | | **855.811** |

83764-00003/4196317.10