

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 20, 2025

**BY ECF**

The Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

    **Re:**     ***United States v. Nicholas Truglia*, 19 Cr. 921 (AKH)**

Dear Judge Hellerstein:

    The Government respectfully submits this letter in advance of the resentencing of Nicholas Truglia ("Truglia" or the "defendant") on July 10, 2025, and as a supplement to our sentencing letter dated April 25, 2025 (Dkt. 141). At the defendant's sentencing in December 2022, the defendant apologized to the victim for the loss and emotional stress that he caused and promised "to give my best effort to [right] my wrongs." (Dkt. 67 at 10). Since that date, he has done the opposite, compounding the harm that he had already caused. In his latest submission, the defendant attacks the victim and offers an array of meritless arguments to support his request for a time served sentence. (Dkt. 147 ("Def. Mem.")). The Court should not countenance the defendant's egregious conduct and should sentence the defendant accordingly.

**A.**     **The Court Should Once Again Reject the Defendant's Constitutional Challenges**

    The defendant's request that the Court reconsider its rejection of his constitutional arguments should be denied. (Def. Mem. at 1-3). As the Court recognized at the hearing on April 29, 2025, Congress granted the Court the authority to resentence where, as here, a defendant knowingly and willfully fails to pay restitution. (*See* Dkt. 143 at 9-11). The defendant offers no additional authority to undercut the statutory language and instead once again seeks to distinguish *United States v. Colasuonno* on the basis that the defendant in that case was on probation rather than supervised release at the time of resentencing. (Def. Mem. at 2 n.2). But, as this Court held at the April 29 hearing, "there's no difference between supervised release [and probation] in this respect." (Dkt. 143 at 10-11). Indeed, nothing in Section 3614 supports the distinction drawn by the defendant, and Section 3613A treats probation and supervised release as equivalent. *See* 18 U.S.C. § 3613A(a)(1) ("Upon a finding that the defendant is in default on a payment of a fine or restitution, the court may, pursuant to section 3565, revoke *probation or a term of supervised release*, modify the terms or conditions of *probation or a term of supervised release*, resentence a defendant pursuant to section 3614 . . . .") (emphasis added).

In addition, contrary to the defendant's assertions, resentencing in this case would not be "unprecedented." (Def. Mem. at 2-3). In *United States v. Bengis*, No. 03 Cr. 308 (LAK), which we cited in our April 25 letter, (Dkt. 141 at 10-11), Judge Kaplan resentenced a defendant to an additional period of incarceration many years after that defendant had completed serving the periods of incarceration *and* supervised release originally imposed. *See United States v. Bengis*, 03 Cr. 308 (LAK), Dkt. 70 (reflecting original 46-month term of incarceration and two-year term of supervised release imposed on June 3, 2004); Dkt. 376 (reflecting resentencing of defendant to 57-month term of incarceration on July 20, 2017). Here, the defendant has not even completed his originally imposed term of supervised release.

**B.    The Court Should Leave the Existing Restitution Order Unaltered**

The Court should also reject the defendant's arguments about the calculations of loss and restitution (Def. Mem. at 3-9), which are inconsistent with relevant statutory language and contrary to the Court's prior rulings in this case.

Pursuant to 18 U.S.C. § 3663A(b)(3)(b), in a case such as this one, involving loss of property the return of which is not feasible, an order of restitution shall require that the defendant return the greater of the value of the property on the date of loss or the value on the date of sentencing. In this case, the value of each of the forms of digital currency stolen from the victim was lower on the date of the original sentencing than on the date of the offense; their value is also expected to be lower on the date of resentencing. Accordingly, the values on the date of the offense must be used.

Consistent with this, at the original sentencing, the Court adopted the Government's loss calculation of $22,660,725, which figure was based on the amount and dollar value of the three forms of digital currency stolen from the victim (3,000,000 Triggers, 20,000 Skycoin, and 12,500 Steem) at the approximate time of the SIM swap on January 7, 2018. (*See* Dkt. 65 at 38-41).[1] That approach was appropriate then, and it remains so today.[2] Indeed, this loss estimate is

---

[1] The dollar values of the three forms of cryptocurrency were determined from historical data obtained on publicly available websites. For Skycoin and Steem, the value was based on the dollar per coin rate at close on January 7, 2018, as reflected on coinmarketcap.com. *See* Exhibit A (reflecting $41.53 per Skycoin at close on January 7, 2018) and Exhibit B (reflecting $6.41 per Steem at close on January 7, 2018); *see also Commodity Futures Trading Comm'n v. Reynolds*, No. 19 CV 05631 (MKV), 2021 WL 796683, at *4 (S.D.N.Y. Mar. 2, 2021) (referring to coinmarketcap as a "reliable valuation tool" for assessing the historical value of Bitcoin). For Triggers, because more precise information was available, the value used of $7.25 per Trigger was based on the approximate dollar per Trigger rate at the approximate time of the SIM swap on January 7, 2018 (*i.e.*, 17:00 EST), as reflected on tradingview.com, rather than the value at close of $6.73. *See* Exhibit C (reflecting that the price of Triggers ranged from just under $7 to $7.57 between 13:30 PST and 14:30 PST (*i.e.*, 16:30 EST to 17:30 EST) on January 7, 2018). The attached Exhibit D summarizes the calculations used to arrive at the $22,660,725 loss amount.

[2] The defendant offers no support for his contention that the value of the Triggers stolen by the conspirators should be based on how many Bitcoins the defendant was able to get for some of

consistent with contemporaneous estimates by the defendant and at least one other conspirator about the value of the currency stolen from the victim. On January 7, 2018, after gaining access to the defendant's phone, one of the defendant's co-conspirators messaged another individual "LOOK AT TRIGGERS . . . its 7 dollars . . . bro . . . its like . . . 21 million." Early on January 8, 2018, the defendant messaged another individual "Stole a wallet" that "Has 20 million in it."

Likewise, the defendant provides no convincing reason to revisit the offset made by the Court at the original sentencing. Section 3663A(b)(3)(b) states that the restitution amount ordered by a court should be reduced by "the value (as of the date the property is returned) of any part of the property that is returned." Nevertheless, the defendant, without offering any authority, contends that the value of Bitcoins received by the victim from another participant in the crime should be based on the value of Bitcoins at the time of the SIM swap. (Def. Mem. at 7-9). The Court considered the question of the relevant date for valuation at the original sentencing and determined that value on the date of payment controlled. (Dkt. 65 at 29-30 ("Can only take value of the day of a particular event that's relevant, and here, the relevant date is the date of payment."). The Court should not alter that determination now.[3]

## C.    The Court Should Reject the Defendant's Proposed Guidelines Range

The defendant's claim that the applicable guidelines range is 3 to 9 months is also meritless. (Def. Mem. at 9-10). The defendant's offense—wire fraud conspiracy—has not changed. He is simply being resentenced for his commission of that offense because of his subsequent knowing and willful failure to pay restitution. As such, and as the Probation Office found, the Guideline applicable to his offense remains unchanged. Furthermore, the defendant is incorrect that the Court is precluded from denying him credit for acceptance of responsibility. (Def. Mem. at 10 n.7). This argument is inconsistent both with his embrace of "a plenary proceeding," (Def. Mem. at 5), and Second Circuit authority. *See United States v. Alkhabbaz*, 413 F. App'x 368, 370 (2d Cir. 2011) (affirming district court's withholding of acceptance credit at resentencing where the defendant jumped bail after the district court originally imposed sentence).

## D.    The Defendant Admitted That He Took Steps to Hide Assets

The defendant's baseless claims that the victim "deliberately" submitted a "pure and knowing lie" to the Court reflect his utter lack of remorse, which the Court should weigh heavily when fashioning an appropriate sentence. (Def. Mem. at 10-12). While the Government has not yet been successful in obtaining a copy of the original program in which the defendant made the statements quoted by the victim, there is no doubt that the program exists.[4] In addition, if

---

[3] those Triggers on the day after the SIM swap, (Def. Mem. at 7), which approach would be contrary to Section 3663A(b)(3)(b)'s command.

[3] At the original sentencing, the Court ultimately adopted an offset amount of $2,281,717.61. For the Bitcoin recovered by the victim, the offset calculation was based on the dollar value of Bitcoin at close on the date of transfer to the victim as found on coinmarketcap.com. (*See* Dkt. 65 at 38-41). The attached Exhibit E summarizes the calculations used to arrive at the $2,281,717.61 offset.

[4] The Government is in the process of seeking to obtain a copy of the original program. If successful, the Government will promptly provide a copy to the Court and the defendant. In the

necessary, the Government is prepared to prove that the defendant made the statements in question. The Government has interviewed two people involved in the production of the original program ("Witness-1" and "Witness-2"), both of whom are listed as "Associate Producers" of the program on a publicly available website. If called to testify, we anticipate that Witness-1 would explain, in substance and in part, that Witness-1's role in the program involved facilitating the defendant's participation. Witness-1 would explain that Witness-1, Witness-2, and the defendant visited the studio of a media company in Brooklyn in or around September 2018.[5] While at the studio, the defendant sat in a chair for an interview. An iPad was placed in front of the defendant's face, which iPad was used to obscure the defendant's identity. During the interview, and in the presence of Witness-1, the defendant made the statements at issue. Witness-1 would explain that Witness-1 took photographs of the defendant while at the studio on the date of the interview, a sample of which are attached as Exhibit F. During an interview with the Government, Witness-2 stated, in substance and in part, that the defendant was involved in the program and that, although Witness-2 was not in the room when the defendant was interviewed, the defendant was likely the person who made the statements at issue because only a small number of people were interviewed for the program. Witness-2 said that only the producers of the program at the media company would know for certain whether the defendant made the statements at issue.

In short, the Government's investigation confirms that months after participating in the theft from the victim of over $20 million in cryptocurrency and before the defendant was incarcerated, the defendant said, in sum and substance, that he had arranged his finances such that he would be able to enjoy the proceeds of his crimes after he served whatever periods of incarceration were imposed upon him. The record of the defendant's conduct since his release from custody in this case—including his admission of possessing "eight figures," his transactions in cryptocurrency, his transfer of hundreds of thousands of dollars into an undisclosed account, and his purchase of luxury items, all without employment—show that is exactly what the defendant has done.[6]

---

meantime, the relevant excerpt of the original program is available at the 31:55 mark of a YouTube video cited by the victim. *See* https://www.youtube.com/watch?v=Xm2X1uKI0Sk (last visited on June 20, 2025).

[5] The defendant does not claim that he was in custody in September 2018, which was about eight months after the SIM swap of the victim and a few months before the defendant was incarcerated in California. (*See* Def. Mem. at 11).

[6] For the reasons explained in our April 25 letter, the defendant merits a sentence at the top of the originally calculated Guidelines range even setting aside the statements he made during the program. However, if the defendant continues to deny that he made the statements, and the Court is inclined to schedule an evidentiary hearing, the Government respectfully requests that the Court schedule that hearing for a date when Witness-1, Witness-1's counsel, and the undersigned are available. Counsel for Witness-1 is scheduled to participate in an approximately two-week trial that is scheduled to begin on July 7, 2025, and Witness-1 is scheduled to be out of the country from July 20 to July 30, 2025. The undersigned Assistant United States Attorney is scheduled to be out of the office between August 4 and August 15, 2025.

**E.    The Defendant Has Willfully Failed to Pay Restitution**

The defendant contends that at the time of his original sentencing he no longer possessed approximately $8 million worth of Ethereum, XMR Monero, and Cardano cryptocurrency that he listed in his financial affidavit in December 2021.  (Def. Mem. at 12).  As noted in our April 25 letter, however, despite repeated instructions to provide a full accounting, the defendant provided no documentation to explain what happened to these assets.  Furthermore, as detailed in our April 25 letter, even holding aside these assets, there is ample evidence to conclude that the defendant continues to have and hide substantial assets available to him to pay restitution, including his post-sentencing statement that he "had eight figures" and his transfer of hundreds of thousands of dollars into an undisclosed account.  (Dkt. 141 at 13-14).  In other words, the defendant's uncorroborated claims about this subset of his cryptocurrency provides no basis for the Court to reconsider its determination that he knowingly and willfully failed to pay restitution.

**F.    Conclusion**

The defendant helped steal over $20 million worth of cryptocurrency from the victim.  As detailed in our April 25 letter, in the years since, he has repeatedly lied to the victim, the Court, and the Probation Office.  At resentencing, the Government respectfully submits that the Court should leave in place the existing Restitution Order and impose a sentence at the top of the original Guidelines range.[7]

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:    ___/s/_____
Timothy V. Capozzi
Assistant United States Attorney
(212) 637-2404

cc:    Mark Gombiner, Esq. (by ECF)

---

[7] As with the previous judgments issued by the Court in this case, the Court should not waive the requirement that the defendant pay interest on the restitution amount.  *See* 18 U.S.C. § 3612(f).